No. 81,586

STATE OF KANSAS, *Appellee*, v. MICHAEL L. COYOTE, *Appellant.*
(1 P.3d 836)

Opinion filed March 10, 2000.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Michael L. Coyote appeals his conviction of second-degree murder in the death of Ronald Hurlbut. He argues that the trial court erred in its response to a jury question outside the defendant's presence in failing to make a record of the proceedings with regard to the jury question, and in admitting several allegedly gruesome photographs into evidence. Finding no reversible error, we affirm.

## Facts

On November 4, 1996, police responding to a request to check on the welfare of Ronald Hurlbut found Hurlbut's body on the floor of his apartment. Hurlbut was lying face down in a pool of blood and was naked from the waist down except for his socks.

According to the coroner, Hurlbut's death was caused by approximately six or seven lacerations to the head which broke the skull. The blood splatter pattern was consistent with Hurlbut being in a prone position when the blows were struck. Hurlbut had a large contusion around his neck and his hyoid bone was broken which suggested pressure having been applied to his neck. Hemorrhaging in the neck muscles also provided evidence of strangulation. It was the opinion of the coroner that strangulation occurred

but did not cause Hurlbut's death. Hurlbut's nose and three of his ribs were also broken and he had several other minor injuries.

Police found some contact bloodstains on the outside of the door jamb leading into the bathroom. There was vomit in the bathroom toilet. In the bedroom, drawers were taken out and various items were scattered about the room. A piece of broken metal was found in the apartment. There was no indication of forced entry.

The defendant was charged with premeditated first-degree murder and first-degree felony murder in connection with Hurlbut's death. Prior to trial, the defendant filed a motion to exclude allegedly gruesome photographs of the victim. The trial court held a hearing on the motion which was ultimately denied.

Hurlbut was openly homosexual. Kathy Keshmiry, a co-worker of Hurlbut at the Veterans Administration Hospital, testified that after work at approximately 10:30 p.m. on November 1, she dropped the defendant off at a bar called the Mug and Jug. John Rokita, a friend of Hurlbut, testified that he ran into Hurlbut at the bar and gave him a ride to the Triangle Club. Rokita left at approximately 1:30 a.m., at which time Hurlbut was talking to "a long-haired Indian looking guy." Nancy Chenowith, a bartender at the Triangle Club, identified the defendant as the person with whom Hurlbut was talking. The defendant was a regular at the Triangle Club.

Andrew Koharchik of the Wichita Police Department asked Chenowith to have the person that Hurlbut was talking with give him a call. The defendant called Koharchik. According to Koharchik, the defendant stated he left the Triangle Club by himself when the bar closed and was not familiar with the victim.

Kleo Coyote, brother of the defendant, was living with the defendant on the night in question. He testified that the defendant came into the house in the early morning hours and had been crying. The defendant told Kleo that he had gone to a bar and began playing pool with Hurlbut. Hurlbut had then asked the defendant for a ride home which the defendant provided. Hurlbut had invited the defendant in to have a few beers. At some point, Hurlbut went into the bathroom and when he came out, he was naked. The defendant told Kleo that Hurlbut had tried to kiss him

and the defendant picked up the nearest object he could find and started hitting Hurlbut in the head with it. The defendant removed a Buddha statue from a book bag and indicated that it was the object with which he had beaten Hurlbut. The statue had blood on it. The defendant told Kleo that he had taken the book bag from Hurlbut's residence in order to carry the statue. The book bag also had a checkbook, I.D., and a medicine bottle in it.

According to Kleo, he, the defendant, and Roger Redger, a friend, went back to Hurlbut's apartment because the defendant's wallet was missing and he thought it had been left in the apartment. The defendant and Redger retrieved the wallet from the apartment. The police had not yet found Hurlbut's body. According to Kleo, the defendant gave the book bag and its contents to Redger.

Redger testified that the defendant came to his house on the night in question and told him that "something messed up had happened." The defendant told Redger that he was sitting on the couch with Hurlbut when Hurlbut attempted to kiss him and a fight ensued. The defendant told Redger that he managed to get Hurlbut in a choke-hold but Hurlbut slipped away and was able to get on top of him. The defendant then grabbed the statue and struck Hurlbut numerous times.

According to Redger, the defendant told him that he had tried to remember everything he had touched and wiped those things down. The defendant showed Redger a scratch on his abdomen that he said came from the altercation. Redger stated that the statue given to him by the defendant had a piece missing. Redger threw away the contents of the book bag but kept the bag. Police later found the bag in Redger's residence.

At trial, the defendant's story was somewhat different. The defendant stated that he had gone to the Triangle Club on the night in question and had consumed approximately a pitcher and a half of beer. The defendant stated that he had a drinking problem. When the bar closed, the defendant left. The defendant felt that he was intoxicated at that time because he had difficulty putting oil in his car before leaving. As the defendant was heading home, Hurlbut waved him down and asked for a ride. The defendant did

not know Hurlbut but remembered that he had been at the Triangle Club that evening.

When the defendant and Hurlbut arrived at Hurlbut's apartment, Hurlbut asked the defendant if he wanted to come in and have some more beer. The defendant stated that he drank two beers and then fell asleep briefly on Hurlbut's couch. When the defendant awoke, he discovered Hurlbut performing oral sex on him. He hit Hurlbut and a fight ensued. The defendant stated that he reacted to Hurlbut in this manner because he had previously been in a foster home where he had been molested.

The defendant stated that he and Hurlbut were wrestling on the floor when he managed to get Hurlbut in a choke hold. According to the defendant, he wanted to choke Hurlbut into unconsciousness, but Hurlbut was able to escape and the fight continued. The defendant stated that he was finally able to trip Hurlbut and get on top of him. At that point, the defendant grabbed the nearby statue and began hitting Hurlbut on the head with it. When he realized what he had done, he vomited in the bathroom. The defendant stated that he then grabbed the book bag to put the statue in, along with the beer bottles he had been drinking, and left the apartment. The defendant confirmed that he later returned to the apartment to retrieve his wallet which had fallen out during the fight.

DNA and hair samples were taken from the defendant. Pubic hair found on the front of Hurlbut's shirt was not consistent with his hair and the defendant could not be excluded as the contributor of that hair based on hair samples. DNA tests also could not exclude the defendant as the contributor of that hair. The defendant also could not be excluded as a contributor of saliva found on Hurlbut's penis or of a semen stain found on the back of Hurlbut's shirt.

During jury deliberations, the jury sent out two questions. One question concerning premeditation was answered by the court after a conference in the presence of the defendant. However, the jury also asked a question regarding whether the definition of "intentionally" had to include all of the words "knowing," "willful," "purposeful," and "on purpose." The trial court answered this question as "No." It does not appear that the defendant was present for the

deliberation of this answer or when the answer was given. There is no transcript regarding this question and answer.

After deliberation, the jury found the defendant guilty of the lesser included offense of second-degree murder. The defendant was sentenced to life imprisonment. He now appeals.

## Discussion and Analysis

*(1) Was the defendant denied a fair trial when the trial court responded to a written question from the jury outside his presence?*

During its deliberations, the jury sent the following question to the trial court: "TO DETERMINE 'INTENTIONALLY,' DOES THE DEFINITION HAVE TO INCLUDE ALL OF THESE WORDS ('KNOWING,' 'WILLFUL,' 'PURPOSEFUL' & 'ON PURPOSE')." The trial court simply answered: "No." There is no record of the question other than the written question and answer. In his brief, the defendant's appellate counsel states that he was informed by the defendant's trial counsel that there was a brief discussion of the question in chambers at a time when the defendant was not present.

A second written question was submitted to the trial court by the jury during its deliberation involving the definition of first-degree murder. While not the subject of this appeal, we note that the trial court followed Kansas statutory and case law in dealing with the jury question. The court advised counsel and the defendant of the question, provided all with an opportunity off the record for input, and after the hearing, resolved the question submitted. Then the court, in writing, answered the jury question. See K.S.A. 22-3405(1); *State v. Bell*, 266 Kan. 896, 919-20; 975 P.2d 239 (1999); *Crease v. State*, 252 Kan. 326, 333, 845 P.2d 27 (1992).

A criminal defendant has the constitutional and statutory right to be present at all critical stages of his or her trial. See K.S.A. 22-3405(1); *Illinois v. Allen*, 397 U.S. 337, 25 L. Ed. 2d 353, 90 S. Ct. 1057, *reh. denied* 398 U.S. 915 (1970). We have held that a conference between a trial judge and juror is such a critical stage and requires the presence of the defendant. *State v. Bell*, 266 Kan. at 919-20; *State v. McGinnes*, 266 Kan. 121, 127, 967 P.2d 763 (1998); *Crease v. State*, 252 Kan. at 333.

The trial court's written response of "no" to the jury without more is error. A trial court, when confronted with a question submitted to it by a jury during deliberations is required to advise counsel, provide the parties with the question, and give them an opportunity for input in the presence of the defendant. Thereafter, the court is required to respond in writing to the jury in the presence of the defendant. The court did not follow this procedure and its failure constitutes error.

K.S.A. 22-3420(3) explicitly requires that any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence unless the defendant is absent voluntarily. The State notes that we have generally held that the defendant's right to be present does not extend to proceedings involving matters of law, citing *State v. Sanders*, 227 Kan. 892, 893-94, 610 P.2d 633 (1980), and argues that the jury's question was one of law.

In *Sanders*, we found that an in-chambers argument on a motion in limine was not a critical phase of the trial requiring the presence of the defendant. 227 Kan. at 894. However, the State's argument in this case ignores the fact that the defendant's right to be present extends to any communication between the trial court and the jury. See *State v. Bell*, 266 Kan. at 920. Thus, there is no question that the trial court's failure to answer the jury's question in the presence of the defendant violated the defendant's statutory and constitutional rights.

The error of the trial court in this case is, however, subject to the same harmless error test as for other constitutional errors:

" ' "An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. [Citations omitted.] Thus, before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. [Citation omitted.]" [Citations omitted].' " 266 Kan. at 920.

Our assessment of harmless error in this case must consider the defendant's additional contention that the answer supplied to the jury's question was an incorrect statement of the law in Kansas. The jury's question refers to Instruction No. 3 which instructs the

jury on first-degree murder. The instruction informed the jury that in order to convict the defendant of first-degree murder, it would have to find that the defendant "intentionally" killed the victim and that such killing was done with premeditation. The instruction then went on to state:

"AS USED IN THIS INSTRUCTION THE TERM(S):
" 'INTENTIONALLY' MEANS CONDUCT THAT IS PURPOSEFUL AND WILLFUL AND NOT ACCIDENTIAL [*sic*]. INTENTIONAL INCLUDES THE TERMS 'KNOWING', 'WILLFUL', 'PURPOSEFUL' AND 'ON PURPOSE.' "

The State argues that any response by the trial court relating to the first-degree murder charge should be considered harmless because the defendant was acquitted of first-degree murder and instead convicted of second-degree murder. However, the defendant was convicted of second-degree murder, which, as instructed by the trial court, also required that the jury find the defendant "intentionally" killed the victim. Although the second-degree murder instruction did not define "intentionally" as did the instruction on first-degree murder, it is probable that the jury considered the definition in determining what the word "intentionally" meant for both instructions.

It is difficult to understand why the trial court chose to define the word "intentionally" only in the first-degree murder instructions and not in the other instructions. The PIK instruction regarding first-degree murder does not define "intentionally" at all. See PIK Crim. 3d 56.01. Instead, the definition used by the trial court is found in PIK Crim. 3d 56.04, which is meant to apply to all homicides. However, the mere fact that the trial court chose to define "intentionally" in one type of homicide and not the other does not make the instructions misleading. The question is whether the court was correct in informing the jury that it did not have to find all of the definitions included in the word "intentionally" to find that the defendant "intentionally" killed the victim.

The definition of "intentionally" used in PIK Crim. 3d 56.04 and the trial court's instruction incorporates verbatim the statutory definition of intentional conduct:

"Intentional conduct is conduct that is purposeful and willful and not accidental. As used in this code, the terms 'knowing,' 'willful,' 'purposeful,' and 'on purpose' are included within the term 'intentional.' " K.S.A. 21-3201(b).

The defendant argues that the jury should have been told that it needed to find all of the terms which are included in intentional conduct in order to conclude that his conduct was intentional. The defendant argues that the jury could have found that he knew what he was doing, that is, that his actions were "knowing," but that his actions, because of his level of intoxication, were not "willful" or "on purpose." There is no argument that the jury was not properly instructed on voluntary intoxication.

K.S.A. 21-3201(b) defines intentional conduct as conduct that is purposeful and willful and not accidental. The instructions to the jury in this case track this definition. After defining such conduct, K.S.A. 21-3201(b) states: "As used in this code, the terms "knowing," "willful," "purposeful," and "on purpose" are included within the term "intentional." The instructions given in this case also track this language. It is clear to this court that the terms "knowing," "willful," "purposeful," and "on purpose" are included as ways of showing intent. The burden on the State is to show intentional conduct but that burden does not include the burden to establish that the defendant's conduct is "knowing," "willful," "purposeful," and "on purpose."

That the terms are meant to be synonymous is shown by the legislature's activity with regard to the statute. Prior to 1992, the statute, rather than defining "intentional," defined "willful" as containing the terms "knowing," "intentional," "purposeful," and "on purpose." See L. 1969, ch. 180, § 21-3201. In 1992, the legislature replaced "willful" with "intentional" and "intentional" with "willful." See L. 1992, ch. 298, § 2. Thus, the trial court's answer to the jury was consistent with K.S.A. 21-3201(b) and fairly stated that law.

Having concluded that the answer given was a correct statement of the law and that the exchange between the court and the jury consisted of a correct written answer to the jury question, we now examine whether we may declare that the court's error in not doing this in the presence of the defendant was harmless error beyond a

reasonable doubt. The instruction given was a correct statement of the law, and the court's discussion with the defendant's trial counsel outside his presence was brief. Under these circumstances, we conclude beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial.

*II. Did the trial court's failure to make a record of the proceedings regarding the answer of the jury's question deny the defendant his right to effective counsel?*

In a related issue, the defendant contends that the trial court's failure to have a record made of the proceedings regarding the answer of the jury's question deprived him of his right to due process and effective assistance of appellate counsel. The defendant is essentially arguing that because the conference in the judge's chambers was not on the record, his appellate counsel is not able to effectively represent him regarding that issue on appeal.

It is true that an indigent appellant is entitled to a transcript of trial court proceedings for purposes of appeal in the same manner as that of a paying appellant. See *Griffin v. Illinois*, 351 U.S. 12, 19-20, 100 L. Ed. 891, 76 S. Ct. 585 (1956). However, where a portion of the record is unavailable because a transcript is lost or is otherwise missing, the inability of the State to provide a full transcript of the trial proceedings does not entitle a defendant to a new trial per se. *State v. Stafford*, 223 Kan. 62, 64, 573 P.2d 970 (1977); *State v. Jefferson*, 204 Kan. 50, 51-52, 460 P.2d 610 (1969). Before a defendant can claim he is entitled to a new trial, the defendant must demonstrate that despite a good faith effort it is impossible to reconstruct the missing portion of the record and this precludes effective appellate review of the issues. *Stafford*, 223 Kan. at 64. Supreme Court Rule 3.04 sets forth a method through which a party to an appeal may proceed with reconstructing a transcript. See Supreme Court Rule 3.04 (1999 Kan. Ct. R. Annot. 23) (a party may prepare a statement of the evidence or proceedings from the best possible means, including the party's own recollection, and submit it to adverse parties for objections and revisions and then to the trial judge to settle and approve).

The defendant states in his brief that he is attempting to reconstruct the record with regard to the in-chambers meeting. However, he makes no showing that a record of the events is impossible to reconstruct despite a good faith effort. He does argue that even a reconstruction would not be sufficient to allow effective appellate review. In support of this assertion, he cites *Bearpaw v. State*, 803 P.2d 70 (Wyo. 1990), and *State v. Lumbrera*, 252 Kan. 54, 845 P.2d 609 (1992). In *Bearpaw*, the Wyoming Supreme Court reversed Bearpaw's conviction when the court reporter's notes of voir dire, opening statements, and closing arguments were lost, which prevented the court from determining whether Bearpaw had received a fair trial. 803 P.2d at 78-79. In *Lumbrera*, this court found error when the closing arguments were not transcribed, although we did not determine whether the error was reversible as the court had already determined to reverse on the basis of cumulative error. 252 Kan. at 73.

Neither of the cases is particularly persuasive in this instance. *Lumbrera* did not deal with the harmless error analysis. The court in *Bearpaw* also did not concern itself with harmless error analysis for the reason that it felt that under prior Wyoming cases, such an error was not subject to harmless error analysis. See 803 P.2d at 79. The *Bearpaw* court did note the difficulty of recreating the details of a missing transcript, saying: "The difficulty with any mutually agreed settlement of the record would involve self-justification by the trial counsel who initially failed to file an adequate designation of the record."

The situation in this case is also factually distinct from that in *Lumbrera*, *Bearpaw*, and in many situations where a transcript is unavailable for whatever reason. In both *Lumbrera* and *Bearpaw*, the argument was that the unavailability of the transcript precluded appellate counsel from determining whether or not errors were made, thus preventing appellate counsel from adequately representing the client. See 252 Kan. at 72-73; 803 P.2d at 78. In *Bearpaw*, the court noted that "[i]tems of concern within the historical facts of this homicide from the standpoint of defense for which present review is not possible could include general criminal trial

issues of unintended occurrence and intoxication among others." 803 P.2d at 78.

The absence of the transcription of the in-chambers discussion in this case does not preclude the defendant from determining if an error was committed. Instead, the in-chambers discussion outside the defendant's presence was itself the error. The in-chambers discussion was brief and informal. Such a discussion is particularly amenable to re-creation if needed. There is no need for the defendant's appellate counsel to have access to the record to show the error; rather, the error is clear. Under the circumstances, the defendant has failed to show that the mere fact that the in-chambers discussion was not transcribed requires reversal of his conviction.

### III. Did the trial court err in allowing the admission of certain photographs of the victim?

The defendant's final argument is that the trial court erred in allowing the admission of allegedly gruesome photographs of the victim. The defendant contends that the photographs were gruesome and shocking and were introduced only in order to inflame the passions of the jury.

In *State v. Barksdale*, 266 Kan. 498, 511, 973 P.2d 165 (1999), we stated with regard to photographic evidence:

" 'The admission of photographs in a homicide case is a matter within the trial court's discretion, and the court's ruling will not be disturbed on appeal absent a showing of abuse of that discretion. *State v. Reed*, 256 Kan. 547, 557, 886 P.2d 854 (1994). While photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. 256 Kan. at 557.

" 'We have held that special care should be taken in admitting photographs taken after a pathologist has intervened in order that the evidence not be more gruesome than necessary. See *State v. Prouse*, 244 Kan. 292, Syl. ¶ 1, 767 P.2d 1308 (1989). In *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975), we held that the trial court abused its discretion in admitting a photograph of the victim 'laid out like a disemboweled beef in a packing plant,' where such a photograph was repetitious and cause of death was not in dispute. However, it is well settled that photographs which serve to illustrate the nature or extent of the

wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death. *State v. Spears*, 246 Kan. 283, 286, 788 P.2d 261 (1990).' *State v. Carr*, 265 Kan. 608, 623, 963 P.2d 421 (1998)."

The State was allowed to admit a large number of photographs showing the decedent's injuries. Many were not objected to by the defendant. However, the defendant contends that six of the photographs were repetitious and unusually gruesome and should not have been admitted because they possessed no probative value.

We have carefully examined the photographs to which the defendant objected. We conclude that none of the photographs were so gruesome as to deny the defendant his right to a fair trial. It is well settled that "photographs which serve to illustrate the nature or extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death." *State v. Spears*, 246 Kan. 283, 286, 788 P.2d 261 (1990). Thus, the trial court did not err in allowing the admission of the photographs into evidence.

Affirmed.