No. 82,526

STATE OF KANSAS, *Appellee*, v. DOMINGO SANTIAGO CALDERON, *Appellant*.

(13 P.3d 871)

Opinion filed December 8, 2000.

*Ralph J. De Zago*, of Herington, argued the cause and was on the brief for appellant.

*Joe E. Lee*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J: Defendant appeals his conviction of second-degree intentional murder, claiming the trial judge erred by (1) dismissing a juror without consulting the defendant; (2) ordering that the closing argument not be translated for the defendant; (3) admitting gruesome photographs, and (4) failing to instruct the jury on the

lesser included offenses of reckless second-degree murder and reckless manslaughter.

On March 2, 1998, Domingo Calderon, also known as Fernando Villarreal, stabbed and killed Francisco Munoz. At trial, Calderon did not dispute that he stabbed Munoz; Calderon claimed that he only intended to wound Munoz.

Calderon and Munoz had a history of animosity. Calderon is from El Salvador and Munoz from Mexico. Witnesses testified that, generally, there often are tensions between Mexicans and El Salvadorans. To show he had reason to defend himself, Calderon testified he had once asked Munoz' fiancee to dance, and Munoz retaliated by beating him. The beating caused an injury that required Calderon to obtain medical attention. In addition, Calderon testified that he believed that Munoz and others had entered into his home and stolen money that Calderon had saved to send to his family in El Salvador. He also testified that one of Munoz' friends had sold Calderon a car that did not run.

On the evening of the altercation, Calderon, who had drunk several beers, was intoxicated when he went to the La Movida bar. At the bar he drank additional beers. When the bar closed, patrons congregated outside the bar to buy burritos and socialize. As Calderon left the bar, he noted that several fights had broken out. Calderon also observed Munoz, who was with three of his friends. Munoz allegedly approached Calderon and threatened to hit Calderon. Calderon drew the knife he carried for protection and stabbed Munoz. The knife entered Munoz' abdomen and severed the aorta, causing Munoz to bleed to death. After stabbing Munoz, Calderon ran from La Movida, returned to his apartment, and went to bed.

During the police investigation, officers questioned Calderon. Calderon stated that when defending himself he attempted to cut Munoz on the arm. When officers searched Calderon's home, they found a knife in the toilet that matched the description of the knife that caused Munoz' death.

Calderon was charged with and tried for murder in the first degree. At the conclusion of the evidence, the jury was instructed on first-degree murder and the lesser crimes of intentional second-degree murder, voluntary manslaughter committed in the heat of

passion or upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person, and involuntary manslaughter committed in the commission of a lawful act of self-defense in an unlawful manner by the use of excessive force. The jury returned a verdict of second-degree murder. Calderon was sentenced to life imprisonment. He appealed, raising four issues. This court's jurisdiction is pursuant to K.S.A. 22-3601(a) and K.S.A. 1999 Supp. 22-3602(a).

## EX PARTE DISMISSAL OF A JUROR

During the evidentiary stage of the trial, a juror telephoned the judge at night and informed the judge that she could not continue to serve as a juror because she was ill. The judge dismissed the juror.

The following morning the trial proceeded with an alternate juror on the panel. Although there is no record of a hearing on the matter of the juror's incapacity or of the judge's replacement of the juror with an alternate, when the trial again commenced the judge stated: "All jurors are present with the exception of Miss Douglas and she has been excused. . . . [Bailiff], if you'll take out the twelve jurors who will decide the case. . . . Miss Bair, you are the remaining alternate juror. The other juror became ill and so we've put in another alternate juror." No objections were made to the judge's substitution of the juror with an alternate. The issue was not raised by the defendant in a motion to dismiss or other post-trial motion.

In his appeal, Calderon contends that the trial judge committed reversible error in dismissing the juror prior to consulting the parties. Calderon asserts that although no actual prejudice resulted from the judge's dismissal of the juror, prejudice is presumed; therefore, he is entitled to a new trial. The State argues that a showing of actual prejudice is necessary for the defendant to obtain relief because Calderon was not prejudiced by the substitution of jurors; therefore, Calderon has no issue to appeal.

In *State v. Fulton*, 269 Kan. 835, 9 P.3d 18 (2000), the trial judge had an off-the-record private discussion with a juror who had committed juror misconduct during deliberations. The judge disqual-

ified the misbehaving juror and replaced her with an alternate juror. Defense counsel objected and requested a mistrial. The motion was denied. The defendant was subsequently convicted. Defense counsel moved for a new trial based on the trial judge's dismissal of the misbehaving juror and the judge's substitution of the alternate juror. The motion for new trial was denied.

On appeal, the defendant asserted that under the circumstances prejudice to the defendant's right to a fair trial is presumed. Fulton argued that the judge's sua sponte dismissal of the misbehaving juror denied the defendant the inquiry necessary to determine whether prejudice had occurred. The *Fulton* court noted that where a judge dismisses a misbehaving juror and replaces that juror with an alternate without giving the defendant an opportunity to question the juror as to the extent and character of his or her misbehavior, the defendant has the burden to show prejudice. 269 Kan. at 844.

Fulton also asserted that the judge's ex parte conversation with the misbehaving juror denied him his constitutional and statutory right to be present at all critical stages of the trial. Under the constitutional standard of review, to determine the error harmless, an appellate court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. 269 Kan. at 845. The *Fulton* court found beyond a reasonable doubt that the defendant's absence during the judge's conference and dismissal of the misbehaving juror had no likelihood of changing the result of the trial.

Here, there was no juror misconduct. The excused juror was incapacitated and could not proceed. The judge's excusing the ill juror was not critical to the trial. Alternate jurors had been selected. One of the purposes for selecting an alternate juror is to replace a juror who becomes incapacitated after the trial has commenced.

Under the circumstances, excusing from further service an ill juror, outside the presence of the defendant, was neither prejudicial nor deprived the defendant of the right to be present at all stages of the trial.

We note that the better practice would have been for the trial judge, on the record and in the presence of the defendant, to notify

the parties of the juror's illness and then substitute the alternate juror. Since there is no claim that Calderon was prejudiced by the judge's replacement of the incapacitated juror, the defendant is not entitled to a new trial on this issue.

## CLOSING ARGUMENT

One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his or her trial. *Lewis v. United States*, 146 U.S. 370, 373, 36 L. Ed. 1011, 13 S. Ct. 136 (1892). A defendant's constitutional right to be present during criminal proceedings stems from the Sixth Amendment right to confront witnesses and the due process right to attend critical stages of a criminal proceeding in which the defendant is not actually confronting witnesses or evidence against him or her. See *Kentucky v. Stincer*, 482 U.S. 730, 745, 96 L. Ed. 2d 631, 107 S. Ct. 2658 (1987); *United States v. Gagnon*, 470 U.S. 522, 526, 84 L. Ed. 2d 486, 105 S. Ct. 1482 (1985). The due process right exists to the extent that a fair and just hearing would be thwarted by the defendant's absence, and to that extent only. *Gagnon*, 470 U.S. at 526; *Snyder v. Massachusetts*, 291 U.S. 97, 107-08, 78 L. Ed. 674, 54 S. Ct. 330 (1934). In other words, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if the defendant's presence would contribute to the fairness of the procedure. *Stincer*, 482 U.S. at 745. To be "present" requires that a defendant be more than just physically present. It assumes that a defendant will be informed about the proceedings so he or she can assist in the defense. *United States v. Mosquera*, 816 F. Supp. 168, 172 (E.D.N.Y. 1993). A defendant's right to be present includes a right to have trial proceedings translated into a language that he or she understands so that he or she can participate effectively in his or her own defense. See *United States ex. rel. Negron v. State of New York*, 434 F.2d 386, 389 (2d Cir. 1970).

K.S.A. 1999 Supp. 22-3405 provides that the defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the

verdict, and at the imposition of sentence, except as otherwise provided by law. Closing argument is a stage of the trial.

To ensure that individuals whose primary language is not English receive a fair trial, K.S.A. 75-4351 provides, in part:

"A qualified interpreter shall be appointed . . . for persons whose primary language is one other than English . . . :

. . . .

"(b) in any court proceeding involving such person and such proceeding may result in the confinement of such person or the imposition of a penal sanction against such person."

K.S.A. 75-4351 and the sections that follow provide the method for selection, appointment, and compensation of interpreters under various circumstances. Although the statutes authorize the expenditure of public funds for that purpose, the statutes do not contain any sanctions against the State for violations thereof. *State v. Zuniga*, 237 Kan. 788, 791, 703 P.2d 805 (1985).

There is no dispute that Calderon required an interpreter. The judge provided an interpreter prior to and for all the stages of the trial. Prior to closing argument, without consulting the parties or stating a reason, the judge instructed the translator to not translate for the defendant during closing arguments. The defense attorney did not object. Closing arguments were made in English and without the use of an interpreter for the defendant.

Calderon asserts that the trial court's order not to translate the closing arguments into Spanish violated 22-3405 and Calderon's constitutional due process right to be present at the closing arguments. Calderon argues that even if he suffered no actual prejudice from the trial judge's order prohibiting an interpreter to translate during closing arguments, it denied him his fundamental right to be present and, under such circumstances, prejudice is presumed.

The State concedes that if Calderon had been unlawfully prohibited from being present, he would be entitled to a new trial. However, the State argues that the right to be present during all stages of a trial pertains only to the defendant's physical presence and not to the defendant's ability to understand the proceedings. The State asserts that the test for determining whether the failure

to provide an interpreter is reversible error is whether the defendant was hampered in presenting his case to the jury.

Courts have found the absence of an interpreter violated due process where the defendant's inability to understand the proceeding or an element of the proceeding resulted in the denial of a fundamental right. In *In re Muraviov*, 192 Cal. App. 2d 604, 13 Cal. Rptr. 466 (1961), the California court found reversible error where there was no translation for the defendant regarding the defendant's right to counsel. In *Parra v. Page*, 430 P.2d 834 (Okla. Crim. 1967), the defendant pled guilty without receiving a translation of the constitutional rights that would be forfeited by the entry of the plea, denying the defendant the fundamental right to a fair trial. In *Gonzales v. State*, 372 A.2d 191 (Del. 1977), the Delaware court found reversible error where the arresting officer was called upon to serve as the defendant's interpreter at trial, creating the inherent possibility of bias.

A significant case in this area is *Negron*. In *Negron*, the interpreter who translated testimony into English for the State met with the defendant, a 23-year-old indigent with a sixth-grade Puerto Rican education who neither spoke nor understood English, during recesses to summarize for the defendant the testimony of witnesses who had completed their testimony. The defense attorney neither spoke nor understood Spanish. The United States Court of Appeals, Second Circuit, stated:

"It is axiomatic that the Sixth Amendment's guarantee of a right to be confronted with adverse witnesses, now also applicable to the states through the Fourteenth Amendment, [citation omitted], includes the right to cross-examine those witnesses as an 'essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.' [Citations omitted.] But the right that was denied Negron seems to us even more consequential than the right of confrontation. Considerations of fairness, the integrity of the fact-finding process, and the potency of our adversary system of justice forbid that the state should prosecute a defendant who is not present at his own trial, [citation omitted], unless by his conduct he waives that right. [Citation omitted.] And it is equally imperative that every criminal defendant—if the right to be present is to have meaning—possess 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.' [Citation omitted.] Otherwise, '[t]he adjudication loses its character as a reasoned interaction . . . and becomes an invective against an insensible object.' [Citation omitted.]" 434 F.2d at 389.

To support its argument that Calderon must show actual prejudice to obtain relief, the State cites *Luu v. Colorado*, 841 P.2d 271 (Colo. 1992), where the defendant contended that the failure to provide an interpreter during closing arguments and instructing the jury violated his right to be present at trial under the Sixth and Fourteenth Amendments to the United States Constitution. Luu argued that the constitutional harmless error standard of review was not applicable to the denial of the right to be present at trial.

The *Luu* court assumed for purposes of the case that the absence of an interpreter for a non-English-speaking defendant at a criminal trial is a denial of the right to be present at trial under federal law. The *Luu* court also recognized that the federal constitutional right to be present is rooted to a large extent in the Confrontation Clause of the Sixth Amendment and protected by the Due Process Clause of the Fifth Amendment where the defendant is not actually confronting witnesses or evidence against him or her

The *Luu* court then noted that since its landmark decision in *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), the United States Supreme Court " 'has recognized that most constitutional errors can be harmless' " and cited *Arizona v. Fulminante*, 499 U.S. 279, 306, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991) (Rehnquist, J., dissenting). 841 P.2d at 273. The *Luu* court noted that in support of this observation, the *Fulminante* Court had relied on *Rushen v. Spain*, 464 U.S. 114, 78 L. Ed. 2d 267, 104 S. Ct. 453 (1983), and concluded that *Rushen* stands for the proposition that denial of a defendant's right to be present at trial may be harmless error. The *Luu* court determined the federal constitutional right to be present is not absolute and is subject to the constitutional harmless error standard of review. 841 P.2d at 273.

In *Fulminante*, the case relied on by the *Luu* court and cited by the dissent in this case, Oreste Fulminante's 11-year-old stepdaughter was brutally murdered in the Arizona desert. Fulminante came under suspicion, but no charges were filed against him. He was later convicted in New Jersey on a different charge. While incarcerated for that offense, he became friends with another inmate, Sarivola. Sarivola was a paid informant for the FBI. Sarivola

became aware that Fulminante was beginning to get some rough treatment from the other inmates because they had heard a rumor that Fulminante had killed a child in Arizona. Sarivola, who had been instructed by the FBI to find out more from Fulminante about his stepdaughter's death, offered to protect Fulminante from the other inmates, but told Fulminante he would only do so if Fulminante would give him the full story. Then, according to Sarivola, Fulminante confessed that he took his stepdaughter to the desert where he sexually assaulted and murdered her. After Fulminante's release from prison, both Sarivola and his fiancee were willing to testify that Fulminante made a similar confession while riding with them in a car.

Based on this new information, Arizona prosecuted Fulminante for the murder of his stepdaughter. At trial, Sarivola testified to both confessions and Sarivola's fiancee testified to the second confession. Fulminante was convicted and sentenced to death. On appeal, the Arizona Supreme Court initially determined that the jailhouse confession had been coerced due to the psychological pressure Sarivola applied to Fulminante, but that the admission of the confession was harmless error because of the overwhelming nature of the evidence against Fulminante. Upon reconsideration, however, the court concluded that United States Supreme Court precedent precluded the use of harmless error analysis in the case of a coerced confession, and reversed Fulminante's conviction. The State of Arizona petitioned the United States Supreme Court for certiorari, which the Court granted.

The first issue before the United States Supreme Court in *Fulminante* was whether Fulminante's confession had been coerced so that its admission into evidence violated Fulminante's Fifth Amendment privilege against self-incrimination. Five of the justices concluded that although the issue was a "close one," the confession had in fact been coerced. This, then, led to the second issue of whether the admission of the coerced confession into evidence mandated automatic reversal or whether the constitutional error could be subject to harmless error analysis. Chief Justice Rehnquist, along with Justices O'Connor, Kennedy, Souter, and Scalia, concluded that the admission of a coerced confession was ame-

nable to harmless error analysis. The majority then determined that admitting the confession was not harmless beyond a reasonable doubt; therefore, the Court agreed with the Arizona Supreme Court's conclusion that Fulminante was entitled to a new trial. 499 U.S. at 302.

Chief Justice Rehnquist's majority opinion began with the general rule that a constitutional error does not automatically require reversal of a conviction. Sixteen cases were cited where constitutional error had been declared harmless, including *Rushen*, where the denial of the defendant's right to be present at trial was declared harmless. 499 U.S. at 306-07. The Court found that the common thread connecting the 16 cases was that each case involved "trial error"—error which occurred during the presentation of the case to the jury and which may therefore be quantitatively assessed in the context of other evidence in order to determine whether its admission was harmless beyond a reasonable doubt. 499 U.S. at 307-08. The *Fulminante* Court divided the realm of error into two mutually exclusive categories: trial error, subject to harmless error analysis, and structural error, which is automatically reversible.

A thorough discussion of the post-*Fulminante* case law at the United States Supreme Court level and in lower court cases can be found in McCord, *The "Trial"/"Structural" Error Dichotomy: Erroneous, and Not Harmless,* 45 U. Kan. L. Rev. 1401 (1996). The article posits that the trial/structural error dichotomy is a flawed structure because it does not take into consideration the wide spectrum of error common to criminal cases and how the degree of error affects the outcome. For instance, McCord points out that the error in *Fulminante,* the admission of a constitutionally flawed confession, was "trial error" subject to harmless error analysis. However, the constitutional violation in obtaining the confession consisted of psychological coercion by the government. Had Fulminante's confession been the product of "rubber hose" coercion, the Court might not have subjected the error to a harmless error analysis but instead have found such error automatically reversible.

A troublesome application of *Fulminante* concerns errors that occur during the trial but do not involve evidentiary questions. See, *e.g.*, *Rice v. Wood*, 77 F.3d 1138 (9th Cir. 1996) (defendant's absence during the pronouncement of jury verdict, harmless error), *cert. denied* 519 U.S. 873 (1996); *Castillo v. Stainer*, 983 F.2d 145, 148 (9th Cir. 1992) (shackling of defendant at trial, harmless error); *Schrier v. Iowa*, 941 F.2d 647, 650 (8th Cir. 1991) (flawed jury instructions, harmless error); *State v. Patterson*, 31 Conn. App. 278, 281 n. 4, 624 A.2d 1146 (1993) (On appeal, court found defendant had waived right to trial judge's presence during voir dire of prospective jurors, but held trial judge's presence cannot be waived by either party in future cases), *rev'd* 230 Conn. 385, 400, 645 A.2d 535 (1994), (trial judge's absence during voir dire of prospective jurors, structural error).

Another troublesome application of *Fulminante* involves error that is arguably structural, but the infringement of the right is relatively insubstantial. See *People v. Woodward*, 4 Cal. 4th 376, 386-87, 14 Cal. Rptr. 2d 434, 841 P.2d 954 (1992), *cert. denied* 507 U.S. 1053 (1993), (trial court properly closed the courtroom but failed to properly notify the defendant of the closure, right to public trial, harmless error); *People v. Harris*, 10 Cal. App. 4th 672, 688-89, 12 Cal. Rptr. 2d 758 (1992) (error in permitting peremptory challenges to be exercised in judge's chambers, structural error); *State v. Knight*, 611 So. 2d 1381, 1382 (La. 1993) (defendant assigned a new lawyer on the day of trial and the judge denied a motion for a continuance to allow counsel to prepare, denial of counsel, structural error).

Two years after *Fulminante*, the United States Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993), recognized that the trial/structural error dichotomy had its limits. The case concerned the issue of what standard of harmlessness should govern in federal habeas corpus proceedings filed by state prisoners. In a footnote, the Supreme Court stated:

"Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the pro-

ceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." 507 U.S. at 638 n. 9.

In the same year that *Brecht* was decided, the United States Supreme Court in *Sullivan v. Louisiana*, 508 U.S. 275, 124 L. Ed. 2d 182, 113 S. Ct. 2078 (1993), again encountered an issue where the trial/structural error dichotomy failed. In *Sullivan*, the defendant had been convicted of first-degree murder and sentenced to death on the basis of a defective reasonable doubt jury instruction. The Supreme Court of Louisiana recognized that the instruction was erroneous but found that it was harmless beyond a reasonable doubt. The United States Supreme Court granted certiorari to resolve the issue of whether such a constitutionally deficient reasonable doubt instruction could ever be harmless error. In a unanimous decision authored by Justice Scalia, the Court held that such an instruction could not constitute harmless error. The Court began the opinion by explaining the constitutional provisions that were violated by the instruction. The Court first noted that the Sixth Amendment right to a jury trial "includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.' " 508 U.S. at 277. Next, the Court noted that the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that the "prosecution bear[ ] the burden of proving all elements of the offense charged, [citations omitted] and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements [citations omitted]." 508 U.S. at 277-78.

In *Sullivan*, the United States Supreme Court explained why such error could not be harmless: "There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the same verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no object, so to speak, upon which harmless-error scrutiny can operate." 508 U.S. at 280. After deciding the case on the basis of the Sixth Amendment to the United States Constitution, the Court recognized *Fulminante*, characterizing it as "[a]nother mode of

analysis lead[ing] to the same conclusion that harmless-error analysis does not apply." 508 U.S. at 281. The Court reasoned:

"Denial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly an error of the former [structural] sort, the jury guarantee being a 'basic protectio[n]' whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function [citation omitted] . . . . The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionable qualifies as 'structural error.' " 508 U.S. at 281-82.

The United States Supreme Court and lower courts have struggled with the *Fulminante's* trial/structural error dichotomy and found that not all errors can be analyzed within the structure. The right to be present at one's criminal trial is a fundamental right. To be "present" requires that a defendant be more than just physically present. It assumes that a defendant will be informed about the proceedings so he or she can assist in the defense. A defendant's right to be present includes a right to have trial proceedings translated into a language that he or she understands so that he or she can participate effectively in his or her own defense.

The United States Supreme Court has stated that it is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause. *Riggins v. Nevada*, 504 U.S. 127, 142, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992). At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. 504 U.S. at 142.

Here, the trial court denied Calderon a meaningful presence during closing argument, an error which implicates the basic consideration of fairness. Under these circumstances, this court is not permitted to determine that it was harmless beyond a reasonable doubt even though the error might have had little, if any, likelihood of having changed the result of the trial.

Because we reverse Calderon's conviction due to the failure of the trial court to provide a translation of closing argument, we will not address all of Calderon's remaining issues. However, because some of the issues may arise in retrial, we will briefly address those issues here.

## ADMITTING GRUESOME PHOTOGRAPHS

Prior to trial, defense counsel filed a motion in limine to exclude certain photographs from evidence. The trial judge sustained the motion as to some photographs and denied the motion as to others. State's exhibits 16 (photograph of victim's torso, including stab wound), 17 (close-up of stab wound upon as it looked upon arrival of victim's body to the hospital), 20 (close-up of stab wound after pathologist pushed flesh back into wound), 21 (close-up of wound showing length measurement by pathologist manually closing the wound), 24 (close-up of aorta damage), 25 (clothing worn by victim), and 26 (close-up of tear in clothing worn by victim) were admitted at trial over objections by the defense. Calderon contends that the photographs had no probative value because they did not tend to prove any fact disputed at trial. He points out that the only disputed facts at trial were motive and intent, and the photographs had no bearing on these issues.

"The admission of photographs in a homicide case is a matter within the trial court's discretion, and the court's ruling will not be disturbed on appeal absent a showing of abuse of that discretion. [Citation omitted.] While photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. [Citation omitted.]

"We have held that special care should be taken in admitting photographs taken after a pathologist has intervened in order that the evidence not be more gruesome than necessary. [Citation omitted.] In *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975), we held that the trial court abused its discretion in admitting a photograph of the victim 'laid out like a disemboweled beef in a packing plant,' where such a photograph was repetitious and cause of death was not in dispute. However, it is well settled that photographs which serve to illustrate the nature or extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death. [Citation omitted.]" *State v. Carr*, 265 Kan. 608, 623, 963 P.2d 421 (1998).

Exhibits 16 and 17 were used several times during the trial to corroborate or demonstrate the testimony of witnesses. An officer who responded to the call at the La Movida regarding a stabbing testified that Exhibits 16 and 17 accurately depicted the victim's wound as he noted it at the scene. The officer also affirmed that he examined the shirt depicted in Exhibit 16 and found a cut in the fabric approximately at the same location and the same length as the cut on Munoz' body. The officer testified that Exhibits 25 and 26 accurately depicted the cut he noted in the fabric of Munoz' shirt.

Exhibit 16 was useful when a State's witness, a woman who administered CPR to Munoz at the scene, became confused on cross-examination about the victim's name and referred to the victim as "Domingo." The State used the photograph to confirm that the person depicted in the photograph was the person she aided at the scene.

Exhibits 20, 21, 24, 25, and 26 were referred to by the forensic pathologist during her testimony regarding the autopsy. Using the photographs, the pathologist explained how she arrived at conclusions regarding the type and size of the knife used to stab Munoz and the position of the person who used the knife to stab Munoz. She used Exhibit 24 to explain how the injury to the aorta resulted in the death of Munoz.

The photographs admitted into evidence over the objection of the defense counsel are not gruesome beyond what is to be expected of post-mortem photographs of a person who died a violent death. The photographs were helpful in explaining and demonstrating the testimony of several witnesses. The trial judge did not abuse his discretion in admitting the photographs into evidence.

## FAILING TO INSTRUCT THE JURY ON LESSER INCLUDED OFFENSES OF RECKLESS SECOND-DEGREE MURDER AND RECKLESS MANSLAUGHTER

The jury was instructed on the lesser included offenses of first-degree murder, including intentional second-degree murder (the crime of conviction) and involuntary manslaughter done in the commission of a lawful act of self-defense in an unlawful manner

by the use of excessive force. The defense counsel requested an instruction on reckless second-degree murder, reasoning that Calderon's testimony was that his intent was to cut Munoz' arm and that the stab wound to the abdomen was an accidental result. Defense counsel did not request an instruction on reckless involuntary manslaughter. The trial judge refused to give instructions based on reckless behavior.

"The trial court has a statutory duty to instruct the jury on lesser included offenses. . . . The duty arises whether or not the defendant requests the instruction at trial. *State v. Sanders*, 258 Kan. 409, 413, 904 P.2d 951 (1995); *State v. Bowman*, 252 Kan. 883, 892, 850 P.2d 236 (1993). Recently, this court restated the standard of review in *State v. Harris*, 259 Kan. 689, 702, 915 P.2d 758 (1996):

" 'We have held that a criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense.' " *State v. Moncla*, 262 Kan. 58, 73-74, 936 P.2d 727 (1997).

Calderon contends that his testimony regarding his intention merely to wound Munoz in the arm is sufficient to establish the duty of the trial court to instruct on reckless behavior. We have reviewed the record. Based on the evidence admitted at this trial, the trial judge was correct in refusing to instruct on recklessness. There was overwhelming evidence of intent and no evidence of recklessness. Under the circumstances, Calderon's self-serving statement regarding his lack of intent did not in itself invoke a duty on the trial judge to instruct on recklessness. See *State v. Clark*, 261 Kan. 460, 466, 931 P.2d 664 (1997).

Reversed and remanded for a new trial.

DAVIS, J., concurs in the result.

ABBOTT, J., dissenting: I would affirm the conviction under the harmless error rule.

Here, the defendant has the burden of showing reversible error. He does not suggest that he was prejudiced. He does not point to any part of the closing argument and contend that he might have given his lawyer information that would have been helpful in his defense. He squarely stands on his constitutional right to be pres-

ent at all crucial stages of his trial. I have no quarrel with that black letter law.

However, an error of constitutional magnitude may be held to be harmless error if we declare a belief that the error was harmless beyond a reasonable doubt. To so hold, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. Coyote*, 268 Kan. 726, 732, 1 P.3d 836 (2000).

I am not persuaded that, under the facts of the case, the presence of a translator for the defendant would have been of any benefit. It is hard to imagine what benefit a jury would have watching a defendant hearing a translation in a language the jury does not understand with some delay between what the jury hears in English and what the defendant later hears in a foreign language.

I would follow the reasoning in *Luu v. Colorado*, 841 P.2d 271, 275 (Colo. 1992), where the Colorado Supreme Court said:

"There is no evidence that the absence of an interpreter interfered with Luu's ability to cross-examine witnesses. Nor is there any indication in the record that the absence of an interpreter during closing arguments and the giving of jury instructions compromised the basic fairness of the trial. . . . In light of the entire record, we conclude under these facts that any error suffered by Luu was harmless beyond a reasonable doubt."

It went on to hold:

"In [*Arizona v.]Fulminante* [499 U.S. 279, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991)], the Supreme Court segregated those cases in which harmless error analysis does not apply from the cases in which harmless error analysis is appropriate. [Citation omitted.] Harmless error analysis does not apply when there is a 'structural defect in the constitution of the trial mechanism.' [Citation omitted.] The *Fulminante* Court cited examples of structural defects as total deprivations of the right to counsel and partial or biased trial judges. [Citation omitted.] Conversely, the *Fulminante* Court emphasized that harmless error analysis applies where a trial error—such as deprivation of the right to be present—occurs. [Citation omitted.]

"Under *Fulminante*, federal law is clear: harmless error analysis applies to allegations of error regarding denial of the federal constitutional right to be present at trial. Accordingly, the court of appeals did not err in determining that the harmless error doctrine should govern Luu's allegations of constitutional error." 841 P.2d at 274-75.

The majority, in essence, determines that the harmless error doctrine cannot apply in this case. In the absence of the defendant making some effort to explain how he was prejudiced, I would hold the error was harmless and affirm the conviction.

MCFARLAND, C.J., joins in the foregoing dissent.