#24137-a-DG

**2008 SD 3**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                         Plaintiff and Appellee,

  v.

KEVIN JAVIER BALLESILLO SELALLA,                Defendant and Appellant.

\* \* \* \*
APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*
HONORABLE PETER H. LIEBERMAN
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

STEVEN R. BLAIR
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.


JEFF LARSON
Minnehaha County Public
 Defender's Office
Sioux Falls, South Dakota               Attorneys for defendant
                                        and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 19, 2007

OPINION FILED **01/02/08**

#24137

GILBERTSON, Chief Justice

[¶1.] On July 27, 2005, a complaint was filed in the South Dakota Second Judicial Circuit charging Rodolpho Hernandez with possession of methamphetamine with intent to distribute in violation of SDCL 22-42-2, possession of methamphetamine in violation of SDCL 22-42-5, and false impersonation with intent to deceive law enforcement in violation of SDCL 22-40-1. On August 10, 2005, a Minnehaha County grand jury indicted Kevin Javier Ballesillo Selalla a/k/a Rodolpho Hernandez (Selalla) on all three charges. A jury trial was held on January 3-4, 2006. The jury returned guilty verdicts on all three counts. On May 8, 2006, Selalla was sentenced to 10 years imprisonment for the violation of SDCL 22-42-2. No sentence was imposed for the convictions on the other counts. The trial court's judgment and sentence was filed on May 15, 2006. We affirm.

FACTS AND PROCEDURE

[¶2.] On July 26, 2005, at approximately 12:00 p.m., Selalla and a companion checked into Room 215 of the Best Western Empire Towers motel in Sioux Falls, South Dakota. Selalla identified himself in English as Carlos Torres Hernandez from Omaha, Nebraska. On his registration he listed that he was driving a Ford Explorer, license number 295 ALT. The license number actually belonged to another vehicle parked outside the motel.

[¶3.] Later that afternoon, Selalla came to the front desk to ask in English if he had received any messages. In the evening, a woman called the front desk from Room 215 to report a suspicious person in the hallway. Not long afterward, a 911 call was placed from the room, but the person making the call hung up. The 911

-1-

operator called the front desk to obtain the room number that the call originated from, and then dispatched Sioux Falls Police Officers Chad Gillen (Gillen) and Eric Kimball (Kimball) to the motel room to conduct a welfare check.

[¶4.] Upon arriving at the motel, Gillen and Kimball went to Room 215. The officers heard the sound of running water emanating from inside. They proceeded to knock on the door, but were unable to get anyone to answer. They then went to the front desk to get a key to the room. When they came back they knocked once more, announcing that they were law enforcement officers. This time, a woman wrapped in a towel came to the door.

[¶5.] Gillen and Kimball told the woman that a 911 call had originated from the room and that they were there to check on her welfare. Once they entered the room, the officers noticed a large glass water bong in plain view on a bedside table. Gillen retrieved a drug-testing kit from his patrol car. He found that the bong tested positive for methamphetamine. The officers took the bong into evidence and arrested the woman, identifying her as Isabel Garcia Vallejo (Vallejo).

[¶6.] After her arrest, Vallejo consented to a search of the room. Inside her purse, Gillen and Kimball found $943 in cash and a "pay/owe" sheet. Hidden in the bed sheets, they found a glass straw, a glass test tube with residue, and a Ziploc bag containing 12 grams of methamphetamine. Various other items of drug paraphernalia were also found about the room. In addition, the officers discovered luggage containing male clothing.

[¶7.] Vallejo was taken to the Sioux Falls Law Enforcement Center. Before departing the motel the officers obtained a photocopy of the I.D. that Selalla presented at the front desk upon check-in. The door to Room 215 was re-keyed and

the front desk clerk was advised to contact the police if Selalla returned to the motel. Law enforcement issued a "be on the lookout" for Selalla and the Ford Explorer.

[¶8.] While in custody, Vallejo was interviewed by John Duprey (Duprey), a narcotics detective with the Minnehaha County Sheriff's Department. Vallejo admitted to being a drug dealer and to having sold drugs in Sioux Falls. She also stated that if she were to give a urine sample it would test positive for drugs. Vallejo told Duprey that Selalla was also a drug dealer involved in distribution in Sioux Falls. She provided Duprey with information as to quantity, frequency, and the number of persons to whom Selalla was dealing drugs. Vallejo indicated that she was cooperating with Omaha police on a significant law enforcement matter. In consideration of that and her cooperation with Sioux Falls law enforcement, Vallejo was given back $100 of the money discovered in her purse. She was told to use the money to rent a motel room for the night and to purchase a bus ticket back to Omaha.

[¶9.] Unbeknownst to Gillen and Kimball, Selalla had returned to the motel before they departed Room 215 for the Law Enforcement Center with Vellejo. Identifying himself as "Rodolpho," he again asked in English at the front desk, if he had received any messages. After learning from the front desk clerk that he had none, Selalla proceeded toward the elevator before turning around and telling the clerk that he was leaving to get something to eat.

[¶10.] Sometime after leaving the motel for the second time, Selalla called his friend Jackie Jensen (Jensen) to ask if she could pick him up. Selalla told her that he had been in a fight with his girlfriend and that he was upset. Jensen picked him

up near the motel and the two drove around while Jensen calmed him down. Eventually, Jensen drove Selalla back to the motel so that he could pick up a change of clothes, as he had decided to stay elsewhere for the night. Upon arriving there, the front desk clerk alerted 911 dispatch to Selalla's return. Officer James Buteyn (Buteyn) was dispatched to the motel sometime after 12:00 a.m. on July 27, 2005.

[¶11.] When Buteyn arrived, he made contact with Jensen who was in her car waiting in the motel parking lot for Selalla. Buteyn took Jensen's car keys and told her to wait until Selalla could be brought to her for identification. However, by this time, Selalla had managed to depart the motel on foot. Buteyn and officer Ryan Flogstad (Flogstad), who had responded to Buteyn's earlier call for backup, soon discovered Selalla's Ford Explorer in the parking lot. The officers ran the plate number on the Explorer, South Dakota 8AE 074, and discovered it was registered to Stacey Lane of Mitchell. Buteyn and Flogstad began searching businesses in the surrounding area for Selalla. Flogstad finally located a Hispanic male matching Selalla's description in the restroom of the Fry'n Pan Restaurant.

[¶12.] The individual identified himself as Juan Martinez, but was unable to spell his name. After consenting to a pat down search, Flogstad found him to be carrying $598 and a title to a Ford Explorer signed by Stacey Lane. Flogstad placed the individual under arrest and took him to the motel where Jensen identified him. He was transported to the Minnehaha County Jail and booked under the name Carlos Hernandez. An FBI check of his fingerprints revealed the name Rodolpho Hernandez. Law enforcement ultimately determined that his name was Kevin Ballesillo Selalla.

[¶13.] Law enforcement obtained a search warrant for the Ford Explorer. Inside the vehicle they discovered a digital scale containing traces of methamphetamine. Law enforcement also found the original Best Western receipt issued to Carlos Hernandez on July 26, 2005. Selalla was charged and later indicted by a Minnehaha County grand jury for possession of methamphetamine with intent to distribute in violation of SDCL 22-42-2, possession of methamphetamine in violation of SDCL 22-42-5, and false impersonation with intent to deceive law enforcement in violation of SDCL 22-40-1.

[¶14.] Although he had conversed with various individuals in English on the day prior to his arrest in Sioux Falls, Selalla claimed he was not fluent in English to the point where he could understand what was going on during the jury trial on the charges pending against him. Prior to the trial, the trial court hired an interpreter to provide simultaneous translation of the proceedings. The Public Defender's Office, which represented Selalla, hired its own Spanish interpreter, at public expense, to aid communication at trial between defense counsel and Selalla. On January 3, 2004, immediately before the trial commenced, the trial court dismissed the interpreter that it had hired for simultaneous translation, noting that Selalla was the only person in the courtroom who needed an interpreter and that the services of one taxpayer financed interpreter were sufficient under the circumstances.

[¶15.] After the jury was seated, the trial court handed out the preliminary instructions to the jury stating that it "use[d] the same preliminary instructions in every single trial, [and that] they don't change because the jobs don't change." The court further stated that specific instructions of the law relevant to the instant case

would be given at the end of the trial before deliberations began. The trial court went on to point out that state law, nevertheless, required it to read the preliminary instructions to the jury. Without objection from defense counsel, the trial court elected not to have the preliminary instructions translated for Selalla, stating that they could be read to him later.

[¶16.] During the defense case-in-chief, Selalla sought to call Duprey to testify to self-inculpatory statements made by Vallejo[1] about dealing drugs and her belief that she would test positive for drug-use if she submitted a urine sample. Selalla also intended to question Duprey about the fact that $100, of what law enforcement believed to be drug money, had been returned to Vallejo, after which she was released. The trial court explained that this line of questioning would "open the door" to the contextual and explanatory evidence from Vallejo's statements inculpating Selalla as a drug dealer and the reason that she had been released—because she was cooperating with law enforcement in Omaha and Sioux Falls who were investigating drug dealers. While objecting to the trial court's position, defense counsel elected not to question Duprey on the matter of Vallejo's self-inculpatory statements.

[¶17.] The trial concluded on January 4, 2006, with the jury returning guilty verdicts on all three counts. Selalla now appeals raising two issues:

> 1. Whether the trial court abused its discretion by its decisions regarding interpreters, therein resulting in a violation of Selalla's constitutional or statutory rights.

---

1. By the time of trial, Vallejo's whereabouts were unknown, except that Duprey testified that he believed her to be somewhere in Omaha, Nebraska.

> 2. Whether the trial court abused its discretion regarding its decision as to the admissibility of hearsay evidence.

## STANDARD OF REVIEW

[¶18.] When there is an assertion of a violation of a constitutional right, we review under the de novo standard. State v. Ball, 2004 SD 9, ¶21, 675 NW2d 192, 199 (quoting State v. Hodges, 2001 SD 93, ¶8, 631 NW2d 206, 209 (citations omitted)). We review the trial court's implementation of courtroom procedures under the abuse of discretion standard. State v. Alidani, 2000 SD 52, ¶¶15-19, 609 NW2d 152, 157-58 (applying the abuse of discretion standard during the review of a trial court's decision to allow a victim-witness assistant to hold the hand of a child victim of sexual abuse during the child's testimony); State v. Daniel, 2000 SD 18, ¶¶10-13, 606 NW2d 532, 534-35 (applying the abuse of discretion standard during the review of a trial court's examination of prospective jurors on various topics during voir dire); State v. Damm, 62 SD 123, 252 NW 7, 10 (1933) (applying the abuse of discretion standard during the review of a trial court's decision to clear spectators from the courtroom during the testimony of a 13-year-old victim of second degree rape).

> To preserve issues for appellate review litigants must make known to trial courts the actions they seek to achieve or object to the actions of the court, giving their reasons. SDCL 23A-44-13. Issues not advanced at trial cannot ordinarily be raised for the first time on appeal. Where error has not been preserved by objection or otherwise, our inquiry is limited to whether the court committed plain error. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of a court." SDCL 23A-44-15 (Rule 52(b)). Unlike harmless error review under SDCL 23A-44-14 (Rule 52(a)), in which the State has the burden of proving the error was not prejudicial, with plain error analysis the defendant bears the burden of showing the error was prejudicial.

State v. Nelson 1998 SD 124, ¶7, 587 NW2d 439, 443 (additional internal citations omitted). "We invoke our discretion under the plain error rule cautiously and only in 'exceptional circumstances.'" *Id.* ¶8 (citations omitted). "The trial court's evidentiary rulings are presumed correct and will not be overturned absent a clear abuse of discretion." Kaiser v. University Physicians Clinic, 2006 SD 95, ¶29, 724 NW2d 186, 194 (citations omitted).

## ANALYSIS AND DECISION

[¶19.]     **1.     Whether the trial court abused its discretion by its decisions regarding interpreters, therein resulting in a violation of Selalla's constitutional or statutory rights.**

[¶20.]     Selalla asserts that the trial court's decisions to proceed with one interpreter instead of two and not translate the preliminary jury instructions, but rather to have them read to him at a later time violated South Dakota law, under SDCL 23A-39-1, which requires a criminal defendant to be present at all stages of a trial. Selalla also asserts that his right to a fair trial guaranteed under the Due Process Clause of Article VI, Section 2 of the South Dakota Constitution, and the Fifth and Fourteenth Amendments of the United States Constitution have been violated. In addition, Selalla contends that his right to counsel, to be present at trial and to confront witnesses guaranteed under Article VI, Section 7 of the South Dakota Constitution and the Sixth and Fourteenth Amendments of the United States Constitution have been violated. Since this Court has not addressed the

nature and scope of a defendant's right to an interpreter as provided by SDCL 23A-22-11 (Rule 28),[2] the issue presented by Selalla is one of first impression.

*The Trial Court's Decision to Dismiss One Interpreter.*

[¶21.] Clearly, a criminal defendant's ability, or lack thereof, to understand the English language and the ruling of the trial court, as to whether an interpreter should be provided for the defendant, implicates the constitutional rights of due process, confrontation of witnesses, and effective assistance of counsel. *See generally* United States v. Johnson, 248 F3d 655 (7thCir 2001); United States v. Carrion, 488 F2d 12 (1stCir 1973), *cert. denied,* 416 US 907, 94 SCt 1613, 40 LEd2d 112 (1974); United States v. Gallegos-Torres, 841 F2d 240 (8thCir 1988); United States *ex rel.* Negron v. New York, 434 F2d 386 (2dCir 1970); People v. Escalante, 627 NE2d 1222 (IllCtApp 1994); People v. Gutierrez, 222 CalRptr 699 (CalCtApp 1986). Nevertheless, as a function of courtroom procedure, we observe that trial courts have been given broad discretion when making this determination. *See* United States v. Khehra, 396 F3d 1027, 1030 (8thCir 2005) (citing United States v. Coronel-Quintana, 752 F2d 1284, 1291 (8thCir 1985); Luna v. Black, 772 F2d 448, 451 (8thCir 1985)); United States v. Gonzales, 339 F3d 725, 727 (8thCir 2003); (acknowledging that the appointment of an interpreter lies within a trial court's discretion) (citations omitted); Martins v. State, 52 SW3d 459, 471 (TexCtApp 2001); *In re* Raymundo B., 250 CalRptr 812, 815 (CalCtApp 1988); State v. Grubbs,

---

2. SDCL 23A-22-11 (Rule 28) provides:

   A court may appoint an interpreter or translator of its own selection and may set reasonable compensation for him.

570 P2d 1289, 1292 (ArizCtApp 1977); *see also Carrion*, 488 F2d at 14-15 (noting that the trial court should have "wide discretion" when determining whether to appoint an interpreter because of the variety of factors that enter into the decision, including the defendant's ability to understand English, and the complexity of the proceedings, issues and testimony) (citing Perovich v. United States, 205 US 86, 91, 27 SCt 456, 51 LEd 722 (1907); United States v. Barrios, 457 F2d 680 (9thCir 1972); United States v. Sosa, 379 F2d 525, 527 (7thCir 1967), cert. denied, 389 US 845, 88 SCt 94, 19 LEd2d 111 (1967)); *Luna* 772 F2d at 451 (8thCir 1985) (quoting *Carrion*, 488 F2d at 14-15); *Johnson*, 248 F3d at 664 (7thCir 2001) (recognizing that as a constitutional matter the appointment of an interpreter is within the trial court's discretion).

[¶22.]    Since this case presents an issue of first impression, we review with interest federal appeals court opinions on the right to interpreters. In 1978, the United States Congress passed the Court Interpreters Act, 28 USC §§ 1827, 1828 (CIA), requiring that federal courts appoint interpreters under certain conditions and establishing statutory guidelines for their use to ensure that the quality of translation does not fall below a constitutionally permissible threshold. *Johnson*, 248 F3d at 661 (citations omitted). Under the CIA, a defendant is only entitled to an interpreter if he "speaks only or primarily a language other than the English language" and that fact inhibits his "comprehension of the proceedings or communication with counsel." *Id*. (quoting 28 USC § 1827(d)(1)). The CIA requires the trial court to evaluate a variety of factors including the defendant's ability to

understand English, the complexity of the proceeding and the testimony. *Id.* (quoting United States v. Febus, 218 F3d784, 791 (7thCir 2000)).

[¶23.] In light of the facts in this case we note *Carrion* and *Johnson* with particular interest. Although *Carrion* predated the CIA by five years, we still find it to be instructive.[3] *See Carrion*, 488 F2d at 14-15 (recognizing the same evaluation factors as mandated by the subsequent CIA). In that case, the defendant had limited English speaking and comprehension skills. *Carrion*, 488 F2d at 15. On appeal, the defendant alleged that the trial court should have held a formal competency hearing to determine if he needed an interpreter. *Id.* Moreover, the trial court refused the defendant's request to allow an interpreter for one of his two co-defendants's to sit between the defendant and the co-defendant on the ground that that would be unworkable. *Id.* at 15. However, the court of appeals upheld the defendant's conviction noting that *the trial court told him that if at any point during the trial there was something he did not understand, he needed only to raise his hand and the testimony would be repeated. Id.* at 15.

[¶24.] In *Johnson*, the trial court appointed *one interpreter* to simultaneously translate the proceedings to the *four defendants. Johnson*, 248 F3d at 659. The defendants objected to this arrangement because they could only communicate with their respective attorneys, through the one interpreter, during breaks in testimony,

---

3. Beyond our recitation of the facts in *Carrion*, we also note with interest that court's statement in reference to a defendant who has difficulty understanding English, "that *he has a right to a court-appointed interpreter* if the court determines that *one* is needed. . . ." 488 F2d at 14 (emphasis added).

thus denying them the ability to simultaneously communicate with their attorneys. *Id*. at 662. In upholding the defendant's convictions, the *Johnson* court opined, "*The CIA provides for simultaneous interpretation of the proceedings, not simultaneous interpretation of attorney-client communications. As long as the [trial] court, when put on notice, adopts a solution that removes the inhibition on communication with counsel, we cannot say that the [trial] court abused its discretion.*" *Id*. at 663.

[¶25.]     *Johnson* is also instructive for other cases that it cites. *See id*. at 662-63 (citing United States v. Sanchez, 928 F2d 1450, 1454-56 (6thCir 1991) (*abrogated on other grounds by* United States v. Jackson-Randolph, 282 F3d 369 (6thCir 2002)) (holding that the CIA authorizes the appointment of one interpreter in multi-defendant trials and finding no abuse of discretion where each of two defendants had a court-appointed interpreter to aid in communication with counsel and the trial court borrowed one of the interpreters in order to translate witness testimony, and the defendants consequently argued they had been prevented from effectively communicating with counsel); United States v. Bennett, 848 F2d 1134, 1139-41 (11thCir 1988) (*superseded on other grounds by Rule as stated in* United States v. Moore, ---F3d--- (11thCir 2007) (holding that the trial court's appointment of a single interpreter to provide simultaneous translation of the proceedings in a multi-defendant trial satisfied the requirements of the CIA; that *nothing in the act required the trial court to appoint additional interpreters to translate communications between the defendants and their attorneys*; and that the trial court thereby acted within its discretion when it refused to do so, but *offered to recess the trial at any time the defendants needed to consult with their attorneys*)); *see also*

United States v. Yee Soon Shin, 953 F2d 559, 561 (9thCir 1992) (finding no error when trial court appointed *one interpreter for two defendants* and holding that the CIA does not require separate interpreters for each defendant in multi-defendant cases); United States v. Lim, 794 F2d 469, 471 (9thCir 1986) (finding no error where communication with counsel was by means of notes and during breaks)).

[¶26.] We also find instructive a number of cases from other jurisdictions. So too in these cases, trial courts have been granted broad discretion when making decisions about whether to appoint interpreters. However, the record must reflect some basis upon which the trial court exercised this discretion before its decision can be affirmed on appeal. In conducting this review, we observe that the refusal below to appoint an interpreter may be upheld where there is evidentiary support for a finding that the defendant is sufficiently fluent in English or the record is otherwise indicative of the defendant's English competency.

[¶27.] There is perhaps no better indication for an appeals court that a defendant can speak and understand English than when the record reflects that he gave testimony or offered some other oral statement. *See* Larias v. State, 528 So2d 944, 944 (FlaDistCtApp 1988) (affirming the decision below not to appoint an interpreter, concluding that the trial court's oral finding was supported, in part, by the record of extensive colloquies between the trial court and the defendant); Gonzales v. State, 356 SE2d 545, 546 (GaCtApp 1987) (holding that the trial court did not abuse its discretion where the defendant gave testimony that revealed he had a sufficient command of English to participate meaningfully in the proceedings without an interpreter); People v. Lopez, 449 NE2d 927, 934 (IllAppCt 1983)

(affirming the trial court's refusal to appoint an interpreter, in part, on the defendant's testimony as to his English competency); State v. Ngoc Van Vu, 339 NW2d 892, 897 (Minn 1983) (affirming the defendant's conviction and noting his extensive hearing testimony without an interpreter); Johnson v. State, 512 So2d 1246, 1250, 1256 (Miss 1987) (affirming the trial court's decision not to provide an interpreter for defendants, concluding that its informal finding that they "were fluent and conversant in English and appeared to have no trouble understanding it," was supported, in part, by transcripts from a previous trial and the trial at bar that reflected the defendants' ability to understand English); State v. Topete, 380 NW2d 635, 636 (Neb 1986) (affirming the trial court's refusal to appoint an interpreter based, in part, on the defendant's English competency, exhibited in testimony at a fluency hearing and at trial); State v. Drobel, 815 P2d 724, 737 (UtahCtApp 1991) (affirming the *pro se* defendant's conviction and the trial court's refusal to appoint interpreters based, in part, on the trial transcript indicating that the defendant had no difficulty communicating with the trial court in English); Cantu v. State, 716 SW2d 688, 690 (TexCtApp 1986) (where the trial court did not order an interpreter to be present for the entire proceeding, affirming the defendant's conviction and sentence based on his English competency as demonstrated in the transcript of his testimony); *see also* Vargas v. State, 627 SW2d 785, 787 (TexCtApp 1982) (affirming the trial court's refusal to provide an interpreter for the defendant's testimony where the transcript revealed that he was able to testify in English without difficulty).

[¶28.] The reviewing court may justify affirming the decision not to appoint an interpreter based on witness testimony relevant to that issue. *See Larias*, 528 So2d at 944 (affirming the decision below, concluding that the trial court's oral finding was supported, in part, by an interpreter's opinion testimony that the defendant spoke " 'just about perfect English' "); *Topete*, 380 NW2d at 636 (Neb 1986) (affirming the trial court based, in part, on the transcript of testimony from a law enforcement officer that he had conversed with the defendant, in English, for over an hour following the arrest).

[¶29.] Courts have also found a record of background information about the defendant as supportive of the trial court's decision not to appoint an interpreter. *See Lopez*, 449 NE2d at 934 (affirming the decision below based, in part, on the trial court's statement, for the record, that the defendant was born in Texas and educated in America, served in the United States Army and had been a county employee for ten years); People v. Boehm, 130 NE2d 897, 899 (NY 1955) (affirming a lower appellate court's reinstatement of conviction where the decision was supported by record evidence that the defendants had lived in and worked throughout the United States for nine years); *Drobel*, 815 P2d at 737 (affirming a *pro se* defendant's conviction based, in part, on his acknowledgment that he was schooled in English and had used it both to conduct business and as United States resident for the previous seven years).

[¶30.] In other cases the decision not to appoint an interpreter has been supported by the trial court's statement as to its observations of the defendant. *See* State v. Perez, 404 NW2d 834 (MinnCtApp 1987) (holding that the trial court's

finding, that the defendant had sufficient command of the English language such that he did not need simultaneous interpretation of the proceedings, was supported by its having heard the defendant's taped confession and testimony at another proceeding); *Johnson*, 512 So2d at 1251 (affirming the decision below and concluding that the trial court's findings were supported, in part, by its observations of the defendant, evincing his English competency); State v. Trevino, 516 P2d 779, 784 (WashCtApp 1973) (affirming the defendant's conviction and noting the trial court's statement for the record, observing that the defendant could "express himself very well" and "had no difficulty testifying"); *see also* State v. Mendez, 784 P2d 168, 170 (WashCtApp 1989) (affirming the trial court's refusal to vacate a sentence where it stated for the record that the defendant obviously "understood the proceedings," and that it had no doubt that the defendant's guilty plea was entered "with full knowledge of [his] constitutional rights").

[¶31.]     In the instant case, the Public Defender's Office arranged for an interpreter to be present to facilitate communication between defense counsel and Selalla, while the trial court arranged for a second interpreter to provide simultaneous translation of the court proceedings. However, immediately prior to the commencement of trial, the trial court dismissed the simultaneous translator. The trial court did not conduct a fluency hearing to determine the extent of Selalla's English comprehension, nor did it enter findings either written or oral in support of its determination that the second interpreter was unnecessary. Moreover, the trial court did not even make an informal comment for the record as to any observation relative to Selalla's ability to understand English. The only justification offered by

the trial court for its dismissal of the simultaneous translator was its statement: "[T]he point of paying for two interpreters' flies by me."

[¶32.] Despite the fact that the trial court made no attempt to support the dismissal by articulating some justification, we might still endorse the trial court's decision were we to find an independent basis in the record to demonstrate that Selalla had no need of a second interpreter. However, no such basis is to be found in the record of this case. Selalla did not testify. There are no demonstrative colloquies between the trial court and the defendant.[4] Furthermore, there is no history offered as to Selalla's place of birth, education or work experience. The record does reflect that Jensen drove around Sioux Falls with Selalla for some time on the night of his arrest and that she does not speak Spanish. Also, the two front desk clerks that spoke to Selalla at the Empire Best Western Towers, Ashley Thiry and Beverly Weyer, and arresting officer Flogstad, all testified to having conversations with Selalla. However, the transcript of testimony as to these conversations falls short of forming a basis to support the trial court's dismissal of the second interpreter. Accordingly, since the trial court entered no findings, nor made any statement for the record as to Selalla's English competency and we find no independent evidentiary support justifying its dismissal of the second interpreter; we conclude this decision was an abuse of discretion.

---

4. There was, however, a short exchange between the trial court and Selalla at the close of the State's case. At that point Selalla was advised of his right to testify in his own defense or remain silent. Selalla replied with one word answers to most of the trial court's five lengthy questions. Selalla did not indicate any inability to understand what was being said by the trial court.

[¶33.]      Nevertheless, we will not reverse the trial court unless Selalla can show that he was unduly prejudiced as a result of the trial court's decision to dismiss the second interpreter. *See* State v. Saldana, 246 NW2d 37, 39 (Minn 1976) (holding that there was no basis to set aside the defendant's conviction where the defendant failed to show any prejudicial effect on his ability to offer a defense due to the absence of an interpreter); *Perez* 404 NW2d at 838; *Carrion*, 488 F2d at 15 (affirming the defendant's conviction where the trial court did not appoint an interpreter for him, but offered to repeat testimony at any time the defendant requested). *See also Vargas*, 627 SW2d at 786 (affirming the judgment below and noting that after the trial court indicated it would provide the defendant an interpreter for his testimony if he "gets into trouble," the defendant thereafter gave his testimony without difficulty and made no further requests for an interpreter).

[¶34.]      When defense counsel objected to the trial court's dismissal of the second interpreter, on the ground that he and Selalla would not be able to freely communicate,[5] the trial court responded as follows:

> I will work with you [defense counsel] and take a recess, . . .
> *if you need to visit with your client, just state that to me* because
> you can't listen to the witnesses, and your client can't listen
> to the witnesses while talking. *If you need to visit, just state
> that to me and I'll be glad to stop the testimony and give you
> an opportunity to do that.*

(Emphasis added).

---

5.      Selalla's argument to this Court is limited to an assertion of abuse of discretion by the trial court. No claim of a breach of the attorney-client privilege by the use of his interpreter to translate for him during the court proceedings is raised.

[¶35.] The trial court extended an offer to stop the proceedings at any time Selalla or defense counsel felt the need to confer. This is relevant to the claim of Selalla that his constitutional right to counsel and confront witnesses was violated by the trial court's Spanish translation arrangements. Specifically, on not one occasion during the proceedings did either Selalla or defense counsel take the trial court up on its offer to suspend the proceedings so that they might counsel together. In light of this fact we find no basis upon which to conclude that Selalla was in any way prejudiced by the trial court's error in dismissing the second interpreter.

*The Trial Court's Decision not to have the Preliminary Jury Instructions Translated at the Time They Were Read to the Jury.*

[¶36.] Because he raised no objection at the time, Selalla now argues plain error, implicating a constitutional violation by the trial court, in deciding not to have the interpreter translate the preliminary jury instructions for Selalla at the time they were read to the jury, but rather to have the interpreter read them to Selalla at a later time.

[¶37.] "Plain error requires (1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Nelson*, 1998 SD 124, ¶8, 587 NW2d at 443 (quotations omitted) (alteration in original). Selalla bears the burden of showing that any such error was prejudicial. *Id.* ¶7.

[¶38.] Prior to its decision regarding the real-time translation of the preliminary jury instructions, the trial court passed out copies of the instructions to each juror and stated:

> I hope that these will give you some guidelines as to what your job is and what my job is. *I use the same preliminary instructions in every single trial, they don't change because the jobs don't change.* At the end of the trial, I am going to give you jury instructions that are specific to this case . . . .

(Emphasis added).

[¶39.]     The State concedes that the trial court erred by not having the interpreter translate the generic preliminary instructions at the time they were given to the jury and that the error is plainly on the record. The State also submits that Selalla may have had statutory and constitutional rights to be present during the reading of the preliminary jury instructions; and that these rights may have been violated by the trial court's decision, thus, potentially affecting a substantial right. We do not need to address these questions because Selalla has failed to show any prejudice conceivably affecting the outcome of the jury's verdict as a result of the trial court's decision to forego the real-time translation of the generic preliminary instructions. Accordingly, we find no plain prejudicial error.

[¶40.]     **2.     Whether the trial court abused its discretion regarding its decision on the admissibility of hearsay evidence.**

[¶41.]     Selalla sought to elicit testimony from Duprey as to Vallejo's admissions that she was a drug dealer and would fail a urine test. The trial court refused to allow this line of exculpatory questioning, unless the State was allowed to *open the door* to elicit Duprey's testimony as to Vallejo's remarks inculpating Selalla in drug distribution in Sioux Falls. Selalla asserts that the trial court's evidentiary ruling in this regard was an abuse of discretion. Selalla argues that the former are admissible as statements against interest by an unavailable declarant,

and thus hearsay exceptions as provided under SDCL 19-16-32 (Rule 804(b)(3)).[6]

On the other hand, Selalla claims that the later remark is not admissible under

Rule 804(b)(3), and further, in the wake of *Crawford v. Washington*, 541 US 36, 124

SCt 1354, 158 LEd2d 177 (2004) is barred as a testimonial statement by an

unavailable declarant in violation of the Confrontation Clause of the Sixth

Amendment to the United States Constitution. In addition to *Crawford*, Selalla

also cites *Williamson v. United States*, 512 US 594, 114 SCt 2431, 129 LE2d 476

(1994), *United States v. Chapman*, 345 F3d 630 (8thCir 2003); and *United States v.*

*Hazelett*, 32 F3d 1313 (8thCir 1994) as supportive of his claim.

[¶42.] In *Williamson*, the declarant was found to be in possession of a large

amount of cocaine following a routine traffic stop. 512 US at 596, 114 SCt at 2433,

129 LE2d 476. During a statement made to a DEA agent, the declarant implicated

himself as a courier in a drug trafficking scheme along with an unidentified

accomplice and the defendant. Later, the declarant disavowed part of his story,

while continuing to implicate the defendant as an accomplice. 512 US at 597, 114

---

6.     SDCL 19-16-32 (Rule 804(b)(3)) provides:

A statement which was at the time of its making so far contrary to the
declarant's pecuniary or proprietary interest, or so far tended to subject him
to civil or criminal liability, or to render invalid a claim by him against
another, that a reasonable man in his position would not have made the
statement unless he believed it to be true, is not excluded by § 19-16-4 if the
declarant is unavailable as a witness. A statement tending to expose the
declarant to criminal liability and offered to exculpate the accused is not
admissible unless corroborating circumstances clearly indicate the
trustworthiness of the statement.

SCt at 2433, 129 LE2d 476.  The declarant was unavailable to testify at trial.  *Id*. at 597, 114 SCt 2434, 129 LE2d 476.

[¶43.]      Under the Rule 804(b)(3) hearsay exception, the government offered the DEA agent's testimony, as to the declarant's confession, implicating the defendant in the scheme, in addition to those parts of the declarant's statement in which he implicated himself.  *Id*. at 597-98, 114 SCt 2434, 129 LE2d 476.  The defendant was ultimately convicted on the strength of the DEA agent's hearsay testimony.  The United States Supreme Court overturned the conviction.  *Id*. at 605, 114 SCt 2437-38, 129 LE2d 476.  The Court held that under Rule 804(b)(3), those parts of an unavailable declarant's statement that inculpate a third party are not properly admitted as evidence, against the third party as part of a holistic statement that includes those parts in which the declarant inculpates himself.  *Id*. at 604, 114 SCt at 2437, 129 LE2d 476.  The Court reasoned that the character of being against penal interest that tends to make a self-inculpatory statement indicative of truthfulness and thus admissible under Rule 804(b)(3), does not cloak a statement inculpating a third party, made in proximity with the self-inculpatory statement, in the same truthfulness.  *Id*. at 600-01, 114 SCt at 2435, 129 LE2d 476.  In analyzing this issue, the Court observed that the advisory committee notes to Rule 804(b)(3) noted that such statements might simply be made to curry favor with law enforcement.  *Id*. at 601, 114 SCt at 2436, 129 LE2d 476 (quoting Rule 804(b)(3), advisory committee notes exception (3)).

[¶44.]      The facts in *Hazelett* parallel those in *Williamson*.  Again, the government apprehended a declarant who implicated herself as a courier in a drug

trafficking scheme along with the defendant. *Id*. at 1314-15. The declarant was later unavailable to testify at the defendant's trial. *Id*. at 1315. The government offered her entire statement under Rule 804(b)(3) including those parts that inculpated the defendant. Citing the holding in *Williamson*, the trial court overturned the defendant's conviction. *Id*. at 1318-19.

[¶45.] Although the defendant's conviction was upheld in *Chapman* on the strength of other evidence, the facts in this case too, were much like those in *Williamson and Hazelett*. *See Chapman*, 345 F3d at 632. While citing *Williamson* in finding the trial court erred by admitting the government's hearsay testimony inculpating the defendant under Rule 804(b)(3), the trial court stated, "by [the declarant] casting himself as a mere mule and serving up [the defendant as the] repeat buyer [of large quantities of marijuana], [the declarant] could reasonably assume that he would be minimizing his criminal liability." *Id*. at 633 (citation omitted).

[¶46.] Prior to the holding in *Crawford*, the door was left ajar by *Ohio v. Roberts,* 448 US 56, 100 SCt 2531, 65 LEd2d 597 (1980) (overruled *by Crawford*, 541 US 36, 124 SCt 1354, 158 LEd2d 177), which conditioned the admissibility of all hearsay on whether it fell under a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Id*. at 66, 100 SCt at 2539, 65 LEd2d 597. Thus, if a declarant's statement did not fall within some "firmly rooted hearsay exception," it might still be admissible if it were judicially determined to bear adequate "indicia of reliability." However*, Crawford* overruled *Roberts* holding that where an out-of-court statement by a witness is testimonial, it is barred, under

the Confrontation Clause, unless the witness is unavailable *and* the defendant had a prior opportunity to cross-examine the witness, regardless of whether the statement is deemed reliable by the trial court. *Crawford*, 541 US at 67, 124 SCt at 1373, 158 LEd2d 177. *Crawford*, included statements given during the course of a police interrogation as those that fall within the ambit of those considered to be "testimonial."[7] 541 US at 52, 124 SCt at 1364, 158 LE2d 177.

---

7. In *Crawford*, the Court endeavored to establish context for the term "testimonial." 541 US at 51-53, 124 SCt at 1364-65, 158 LE2d 177. The Court opined that testimonial statements included:

> *"ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" These formulations all share a common nucleus and then define the Confrontation Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition-for example, *ex parte* testimony at a preliminary hearing.
> *Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.* Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The statements are not *sworn* testimony, but the absence of oath was not dispositive. . . . Under the Marian statutes, witnesses were typically put on oath, but suspects were not. Yet Hawkins [in 2 W. Hawkins, Pleas of the Crown, ch 46, § 3, pp. 603-604 (T. Leach 6th ed. 1787)] and others went out of their way to caution that such unsworn confessions were not admissible against anyone but the confessor.

(continued . . .)

#24137

[¶47.]     *Crawford*, however, is not an absolute bar to out-of-court testimonial statements made by an unavailable declarant whom the defendant had no prior opportunity to cross-examine.  The case of *State v. Prasertphong*, (*Prasertphong II*), 114 P3d 828 (Ariz 2005) is illustrative of this point.  *Prasertphong II* involved a case of two co-defendants tried and convicted for the robbery-murder of three pizza-parlor employees.  *Id.* at 829.  The declarant made self-inculpatory statements, admitting to all three murders, and also inculpated the defendant by alleging acts that attributed substantial responsibility in the crime to the defendant.  *Id.* at 829-30.  At trial, the defendant, under Arizona's version of Rule 804(b)(3), sought to admit *only the self-inculpatory portions of the declarant's written statement that tended to exculpate the defendant.  Id.* at 829.  The prosecution agreed that these statements where admissible.  However, the prosecution argued that under

_____

(. . . continued)

> That interrogators are police officers rather than magistrates does not change the picture either.  Justices of the peace conducting examinations under the Marian statutes were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function.  England did not have a professional police force until the 19th century, so it is not surprising that other government officers performed the investigative functions now associated primarily with the police.  The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace.  In sum, even *if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.*

> *Id.* (internal citations omitted) (first and third emphasis added, second emphasis original).

(continued . . .)

#24137

Arizona's version of the "rule of completeness," Rule 106,[8] those parts of the co-defendant's statement, inculpating the defendant should also be admitted if the defendant sought to introduce into evidence those statements that tended to exculpate him. *Id.* at 829-30. The defendant in *Prasertphong II* argued that admitting the whole statement including those inculpating him in the crime violated his Sixth Amendment right to confrontation. *Id.* at 830. The trial court disagreed with the defendant citing Rule 106.

[¶48.]    In affirming the judgment, the Arizona Supreme Court pointed out the limitation of the holding in *Crawford*. *Id.* at 834. The court acknowledged that while a statement may be admissible under a hearsay exception, it still may run afoul of Confrontation Clause requirements. *Id.* at 831 (citations omitted). Significantly for our analysis of the instant case, the court noted that because *the defendant* proffered selected portions of the co-defendant's statement, his Sixth Amendment right to confrontation was not implicated.

[¶49.]    In analyzing the "rule of completeness" the Arizona court noted that the language of Rule 106 does not mandate that an entire statement necessarily be admitted, but rather those parts that are "necessary to explain or place into context

_____

(. . . continued)

8.    SDCL 19-9-13 (Rule 106) is functionally identical to Arizona's version of Rule 106 and provides as follows:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

the portion already introduced." *Id.* (citing United States v. Branch, 91 F3d 699, 728 (5thCir 1996) (quoting United States v. Pendas-Martinez, 845 F2d 938, 944 (11thCir 1988))). As a consequence, the court held that when a defendant makes the tactical decision to admit a fragmentary part of an accomplice's conversation under Rule 804(b)(3), the government cannot simultaneously be precluded from introducing other evidence from the conversation. *Id.* at 832 (citing State v. Soto-Fong*, 928 P2d 610, 618 (Ariz 1996) (holding that a defendant's introduction of *an informant's* statement to police recounting a conversation with an accomplice, who made self-inculpatory statements, precluded the defendant from resisting the prosecution's introduction of a statement, made during the same conversation, that inculpated the defendant). The court then observed its holding was consistent with other jurisdictions' and federal courts' interpretations of "the rule of completeness." *Id.* at 832-33 (citing State v. Roberts, 14 P3d 713, 718 (Wash 2000); Ramirez v. State, 739 So2d 568, 580 (Fla 1999); Carr v. State 655 So2d 824, 835 (Miss 1995); Kennard v. State, 531 So2d 934, 935, 937 (Ala 1986); Burke v State, 484 A2d 490, 496-97 (Del 1984); United States v Moussaoui, 382 F3d 453, 481-82 (4thCir 2004); United States v. Washington, 12 F3d 1128, 1137 (DCCir 1994).

[¶50.] Finally, the Arizona court cited *Crawford* itself for the proposition that Rule 106 stands intact post-*Crawford*, as an exception to the Confrontation Clause, because the admittance of evidence under the "rule of completeness" is not predicated on a showing of reliability.

> [T]he *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability

> with a wholly foreign one. In this respect, it is very different
> from exceptions to the Confrontation Clause that make
> no claim to be a surrogate means of assessing reliability.
> For example, the rule of forfeiture by wrongdoing (which
> we accept) extinguishes confrontation claims on essentially
> equitable grounds; *it does not purport to be an alternative
> means of determining reliability.*

*Id.* at 834 (emphasis added) (citing *Crawford*, 541 US at 62, 124 SCt at 1354, 158 LEd2d 177 (citation omitted)).

[¶51.]     The facts of the instant case parallel those of *Prasertphong II*. The absent Vallejo's statement, made to Duprey during the course of his interrogation, was clearly testimonial as defined by *Crawford*. Selalla sought to elicit the exculpatory parts through Duprey's testimony. The trial court agreed to allow this line of questioning under our Rule 804(b)(3). However, consistent with our Rule 106, it determined that it would also allow the State to "complete the picture" by eliciting testimony from Duprey about Vallejo's statements inculpating Selalla in the Sioux Falls drug trade. In the context of Vallejo's admissions and her arrest in a motel room she had rented with Selalla, which contained substantial quantities of methamphetamine and drug paraphernalia, her statement inculpating Selalla in the drug trade was explanatory as to why he had a scale for measuring drugs in his vehicle and was obviously trying to evade police that were waiting for him at the motel late on the night of July 26, 2005. Nevertheless, Selalla objected claiming that the ruling violated his Sixth Amendment right to confrontation. Selalla now has offered *Williamson, Hazelette, Chapman* and *Crawford* to support this claim that the "rule of completeness" is subordinate to his right to confrontation.

[¶52.]     What Selalla overlooks is that in each of those cases *the prosecution introduced inculpatory hearsay evidence against a defendant.* Those cases are distinguishable from the case where *a defendant seeks to use Rule 804(b)(3) as a shield,* to introduce exculpatory parts of an unavailable declarant's statement, *while simultaneous using the Confrontation Clause as a sword*, as was attempted previously by the defendant in *Prasertphong II* and again today by Selalla, to exclude those parts that inculpate the defendant. *Prasertphong II*, 114 P2d at 834-35 (citations omitted). If this Court were to reverse Selalla's conviction on these grounds, we would eviscerate the "rule of completeness." The result would be to set up unfair outcomes arising out of not-so-hypothetical scenarios such as that of the declarant who confesses to the police that he murdered two people, but then subsequently, during the same interview, says that the defendant forced him to do it. Applying Rule 804(b)(3), the defendant could introduce the first portion of the declarant's statement to the police because it was a statement against interest; then trumping the State's right to introduce the second statement under Rule 106 by invoking the Confrontation Clause under the banner of *Crawford. See id.* We refuse to establish that unfair precedent. Accordingly, we find that the trial court acted within its discretion in ruling that the introduction of favorable hearsay by Selalla would properly enable the State to complete the picture by eliciting other evidence from the rest of Vallejo's statement to Duprey.

[¶53.]     Affirmed.

[¶54.]     MEIERHENRY, Justice, concurs.

[¶55.]     SABERS and ZINTER, Justices, concur specially.

[¶56.]　　　　KONENKAMP, Justice, dissents.

SABERS, Justice (concurring specially).

[¶57.]　　　　The issue is not whether the trial court abused its discretion in appointing an interpreter for the Defendant, but whether the trial court abused its discretion in forcing the Defendant to share his interpreter with the State.

[¶58.]　　　　I agree with the majority opinion that the trial court abused its discretion by failing to make a record "to support the trial court's dismissal of the second interpreter." *Supra* ¶32. The key question is whether confidential communications between Defendant and his attorney had occurred prior to the "forced sharing" of Defendant's interpreter and whether that "forced sharing" resulted in prejudice to Defendant's case. Because the record is void of any showing of actual prejudice in that respect, I join in the affirmance of these convictions.

ZINTER, Justice (concurring specially).

[¶59.]　　　　I concur and write to include some clarifying points relating to Selalla's entitlement to two interpreters. I also write to discuss the standard of review concerning the trial court's failure to require simultaneous interpreting of the preliminary jury instructions.

*Two Interpreters*

[¶60.]　　　　First, in my view, the nature of Selalla's case for interpretive services has been mischaracterized. Notwithstanding the other writings, the record does not support the special concurrence's characterization that this is the type of case in

which the court "forced sharing" of Selalla's interpreter in order to assist the court. *See supra* ¶58. Nor does the record support the dissent's characterization that this is the type of case in which the trial judge "commandeer[ed]," "borrowed," "confiscate[d]," "seize[d]" and "appropriated" Selalla's interpreter to "work for the court." *See infra* ¶¶73-74, 76, 80, n20. Those types of cases involve a trial court's *actual use* of a defendant's interpreter to *simultaneously* interpret for the defendant *and* the court, jury, or other participant in the trial. *See* State v. Gonzales-Morales, 91 WashApp 420, 422, n1, 958 P2d 339, 340 (WashApp 1998) (explaining that because the trial court was unable to find a second interpreter, it "borrowed" defendant's interpreter to simultaneously interpret a Spanish-speaking witness for the prosecutor, jury, and other courtroom participants while also facilitating communication between defendant and his counsel).[9]

[¶61.]     This is a case in which Selalla's public defender arranged for one publicly financed interpreter on his own. In addition, for reasons not explained in the record, the circuit court administrator also arranged to have yet another interpreter present. It appears that Judge Lieberman was not aware of these

---

9.    The Washington Court of Appeals described the "borrowing" situation as follows:

> In Jairo Gonzales-Morales's trial for second degree assault, the court appointed an interpreter to facilitate Gonzales-Morales's communications with his attorney. When a Spanish-speaking witness for the State testified, the court "borrowed" Gonzales-Morales's court-appointed interpreter to translate the State's witness's testimony. If Gonzales-Morales wished to speak to his attorney during this time, he was to request a recess from the court.

*Gonzales-Morales*, 91 Wash App at 421, 958 P2d at 339.

arrangements because when both interpreters appeared that first morning of trial, he conducted an off-the-record discussion with counsel. Following that discussion, he made a determination on the record expressly finding that "the only person in this courtroom who will need an interpreter is the defendant." Thereafter, for the first time, Selalla's trial counsel indicated that he would like both interpreters: an "official interpreter" for the trial and a "personal interpreter" in case Selalla had any questions during the trial or during breaks. Because both interpreters were publicly financed, this is a case where defense counsel asked the trial court to appoint a personal interpreter in addition to a trial interpreter.[10] Selalla did not, however, make any factual showing suggesting the need for two such interpreters because of any language difficulty.

[¶62.] The court determined that because Selalla was the only person in the courtroom in need of an interpreter, there was no need for two interpreters.[11] The

---

10. The dissent disputes this point on the semantic argument that defense counsel did not ask the trial court to "appoint" both interpreters, noting that "defense counsel's interpreter was hired under the public defender's separate budget, not the court's budget." *See infra* ¶75. This technicality does not, however, change the fact that defense counsel asked to have two publicly financed interpreters. More fundamentally, the extent of the constitutional right to publicly financed interpretive services is not dependent on the public budget from which the interpreter is paid.

11. The dissent suggests that the trial court dismissed the second interpreter for economic reasons, *see infra* ¶73. The dissent also suggests that without two interpreters, trial counsel was unable to communicate with his client. *See infra* ¶73 (stating that after the court removed the second interpreter, defense counsel responded that without both interpreters he could not communicate with his client). Neither suggestion is correct. The transcript, when viewed in context, reveals that the second interpreter was dismissed and economics were mentioned because there was no showing of need. The transcript further reflects that defense counsel's concerns about client

(continued . . .)

_____

(. . . continued)

communication were hypothetical, but in any event, they were resolved, without objection, by the court's protective procedures.

The entire transcript on these issues is terse, but it reflects that the court's decision to deny two interpreters was based on need, and therefore, there was no reason to pay for two interpreters. The court raised this matter as the very first order of business, and began the discussion only mentioning need:

> We have had discussions off the record as to the fact that there are two interpreters here. I have determined that the only person in this courtroom who will need an interpreter is the defendant; therefore the Court does not see any *reason for two interpreters*.

After the off-record hearing and ruling, the court provided defense counsel an opportunity to make a record. In making a record, defense counsel did not make any showing of need for two interpreters. Instead, defense counsel explained that his general practice in some "other cases" was to use two interpreters. Counsel argued:

> [A]*s I have done in other cases* involving the need for an interpreter where I -- where we wanted an interpreter for a person that doesn't speak English fluently, I have hired Daya Thorin, who is here [today], just to interpret for my client *should he* have any questions during the trial as frequently happens or during breaks while the jury is outside the courtroom here and just to have a way of speaking with my client during trial.

Counsel then noted that the other interpreter was also present that morning as a result of the court administrator, and counsel continued:

> [A]s *I said I have done in cases in the past*, [the one interpreter] is here under the Court's direction through Court administration to interpret from the witnesses, from the Court, from the attorneys; and [the other interpreter] is here, more as a personal interpreter so my client and I can communicate because otherwise we can't.

The trial court then responded that it would provide accommodations so Selalla's publicly financed interpreter could interpret and facilitate communications between Selalla and counsel. The court informed Selalla that if he felt uncomfortable, that it would take a recess. It also told trial counsel that if he needed to visit with Selalla during a witness's testimony, to inform the court, and that the court would stop the testimony so counsel could visit with Selalla. Following this offer, trial counsel did not object to

(continued . . .)

court ordered Selalla's interpreter to remain to assist Selalla and his attorney, and the second interpreter was excused. There is no dispute that thereafter, Selalla's interpreter was not actually used by the court ("borrowed") to interpret for the court, jury, any witness, or for anyone other than Selalla.[12] Because the record does not reflect that Selalla's interpreter was ever used to simultaneously interpret for the court and for the defendant, and because it appears that Selalla's own interpreter remained continuously available throughout the trial for Selalla and his counsel, this is not a borrowing or commandeering case.

[¶63.] Furthermore, even if this were a "borrowing" case, the court utilized the appropriate procedure to ensure that Selalla's constitutional rights were protected. *See Gonzales-Morales,* 91 WashApp at 424-27, 958 P2d at 341-42 (collecting cases that have approved similar protective procedures). The *Gonzales-Morales* court noted with approval that although that trial court borrowed the defendant's interpreter to interpret a state witness, it also made the necessary accommodations for the defendant to consult and communicate with his attorney. The trial court in *Gonzales-Morales* informed the defendant:

---

(. . . continued)

the court's ruling or accommodation. Most importantly, thereafter, counsel never indicated to the court that the court's ruling or accommodation was causing a language difficulty for counsel or Selalla. In sum, the dissent is incorrect in suggesting that the second interpreter was dismissed solely because of economics and that without the second interpreter, counsel was unable to communicate with Selalla.

12. The trial transcript does not indicate that any Spanish speaking witness testified, which would require the assistance of an interpreter for the court, counsel, or the jury.

> I am going to allow the interpreter to remain there at the defense table and she can interpret [the prosecutor's] question, which she would be doing anyway, and can interpret the answer in Spanish for the court. The defendant will be able to understand the answer himself anyway because he speaks the same language as the witness. . . .
>
> [The interpreter] should stay there at the defense table and if the defendant has any question to ask counsel, then he can just let us know and we'll interrupt the questions and answers being given so that he can communicate freely and thoroughly with his attorney.

*Id.* at 422, 958 P2d at 340. *Gonzales-Morales* concluded that there was no constitutional violation in light of the case law and this protective procedure. The court did so even though it was "mindful of the serious constitutional dimensions surrounding a non-English speaking criminal defendant's right to have meaningful access to counsel." *Id.* at 428, 958 P2d at 343.

[¶64.] In Selalla's case, the trial court employed the same protective procedure even though this interpreter was not borrowed to simultaneously interpret for the defense and for the court. The court informed Selalla and counsel:

> [T]here is only one person in the courtroom [Selalla] who needed an interpreter, and if at any point during the trial you feel inhibited, in any way whatsoever, I will work with you and take a recess. . . . We have interpreters so that as the witnesses are testifying, your client will be interpreted to and if you need to visit with your client, just state that to me because you can't listen to the witnesses, and your client can't listen to the witnesses while talking. If you need to visit, just state that to me and I'll be glad to stop the testimony and give you an opportunity to do that.

Under the overwhelming weight of authority, this procedure sufficiently protected Selalla's constitutional rights to confrontation, counsel, and due process even if the trial court had borrowed his interpreter. *See Gonzales-Morales* and its collected

authorities, 91 WashApp at 428, 958 P2d at 343 (citing six federal and four state court decisions affirming use of a single interpreter over claims of entitlement to two interpreters as long as an opportunity for recess and consultation were provided).

[¶65.]     Nevertheless, Selalla's trial and appellate counsel have asserted that a non-English speaking defendant is entitled to two interpreters as a matter of law: one to interpret for the defendant and one to facilitate communication between the defendant and counsel.  With the possible exception of two cases that are not relevant here, this asserted right to two interpreters is not supported by any case cited by Selalla or the dissent.  It is also unsupported generally.  *See infra* ¶67.  Because Selalla's interpreter was not borrowed or commandeered, and because Selalla made no factual showing of need for two interpreters, it is my view that the trial court did not abuse its discretion in limiting Selalla to one publicly financed interpreter.

[¶66.]     I also disagree with the dissent's premise that Selalla's level of understanding the English language is "irrelevant in the context of this case and should be no part of our analysis." *Infra* ¶74.  On the contrary, the right to an interpreter does not simply hinge on a request:  it is dependent upon a showing of an actual language disability.  United States v. Arthurs, 73 F3d 444, 447 (1stCir 1996).  Although many of the federal cases have been decided in the context of the federal statutory right to an interpreter, the point at which the need arises is the same.

> Yet how high must the language barrier rise before a defendant
> has a right to an interpreter?  It is well settled that there is no

> right to an interpreter if the foreign-born defendant speaks fluent English and is "completely aware of all the proceedings". Cervantes v. Cox, 350 F2d 855 (10thCir 1965). The status of the right becomes less certain, however, where, as in the present case, the defendant has some ability to understand and communicate, but clearly has difficulty.
>
> Because the determination is likely to hinge upon various factors, including the complexity of the issues and testimony presented during trial and the language ability of the defendant's counsel, considerations of judicial economy would dictate that the trial court, coming into direct contact with the defendant, be granted wide discretion in determining whether an interpreter is necessary. *See* Perovich v. United States, 205 US 86, 91, 27 SCt 456, 51 LEd 722 (1907); United States v. Barrios, 457 F2d 680 (9thCir 1972); United States v. Sosa, 379 F2d 525, 527 (7thCir 1967), cert. denied, 389 US 845, 88 SCt 94, 19 LEd2d 111 (1967). It would be a fruitless and frustrating exercise for the appellate court to have to infer language difficulty from every faltering, repetitious bit of testimony in the record. But precisely because the trial court is entrusted with discretion, it should make unmistakably clear to a defendant who may have a language difficulty that he has a right to a court-appointed interpreter if the court determines that one is needed, and, *whenever put on notice that there may be some significant language difficulty, the court should make such a determination of need.*

United States v. Carrion, 488 F2d 12, 14-15 (CA 1973) (emphasis added).

Ultimately:

> [b]ecause the determination is likely to hinge upon various factors, including the complexity of the issues and testimony presented during trial and the language ability of the defendant's counsel, considerations of judicial economy would dictate that the trial court, coming into direct contact with the defendant, be granted wide discretion in determining whether an interpreter is necessary.

*Id.* (citing *Perovich*, 205 US at 91, 27 SCt 456, 51 LEd 722; *Barrios*, 457 F2d 680;

*Sosa*, 379 F2d 525, 527).

[¶67.]     In today's case, there is no dispute that Selalla needed some level of interpretive services, and one publicly financed interpreter was provided.   There is also no dispute that trial counsel did not put the court on notice that Selalla was having any language difficulty that required two interpreters.[13]  Because Selalla did not make any showing of need, his appellate argument is in essence that interpretation of witnesses and communication with counsel requires two interpreters as a matter of law.   As was previously mentioned, however, the overwhelming consensus of authority does not support that claim.  *See Gonzales-Morales*, 91 WashApp at 428, 958 P2d at 343 (collecting cases).  *See also Carrion*, 488 F2d at 15 (noting that the court must be put on notice of some significant language difficulty, and that protective procedures are sufficient to satisfy constitutional requirements).

---

13.   The dissent suggests defense counsel should not have to justify why it was necessary to have a personal interpreter for his client. *Infra* ¶75.  That is not, however, the issue.  The issue in this case is the need for two interpreters, and as is explained in ¶66, *supra,* the court must be put on notice of that alleged need.  Therefore, if there was an *actual* (as opposed to hypothetical) need for two interpreters *in this case*, trial counsel had an obligation to make that showing.

The dissent excuses the absence of a showing suggesting that the trial judge made his decision before defense counsel had an opportunity to make a showing. *Infra* ¶73 (stating that defense counsel was allowed by the judge to make a record after the judge announced his decision).  The record, however, reflects that the issue was argued in chambers, out of the presence of the jury, off the record, and following that discussion, the judge went on the record allowing counsel to make a showing.  If an actual need had been demonstrated in the off-the-record discussion, it was counsel's obligation to replicate that showing on the record.  Counsel failed to do so, and without an adequate showing, two interpreters cannot be justified.

[¶68.]    In summary, Selalla failed to make any showing that his interpreter was borrowed by the court. Even if his interpreter was borrowed at any point in the trial, the court employed the appropriate protective procedure. Moreover, Selalla did not show that the trial court's ruling rendered him unable to understand the proceedings, unable to communicate with counsel, unable to assist in his defense, or unable to cross-examine the witnesses. Finally, Selalla has failed to show that a defendant in his circumstances has a legal right to two interpreters. Therefore, his claim fails both factually and as a matter of law.

*Structural Error not Applicable and Plain Error not Established*

[¶69.]    I finally disagree with the dissent's assertion that the failure to interpret the preliminary jury instructions at the time they were first read to the jury resulted in structural error. *See infra* ¶81. As previously noted, these questions involving interpreters are fact sensitive, discretionary matters for the trial court. *Supra* ¶66; United States v. Khehra, 396 F3d 1027, 1030 (8thCir 2005); Luna v. Black, 772 F2d 448, 451 (8thCir 1985) (citing United States v. Carrion, 488 F2d at 14-15); State v. Hernandez, 820 P2d 380, 382 (IdahoApp 1991). Because these decisions are discretionary and involve complex factual situations that differ in every trial setting, structural error analysis is ill-fitted to appellate review.

[¶70.]    Indeed, rather than applying structural error analysis, this issue is reviewed for plain error, which requires a showing of prejudice. *See* United States ex rel. Negron v. State of New York, 310 FSupp 1304, 1308 (DCNY 1970) (applying prejudice/harmless error analysis to the alleged deprivation of the right to an interpreter); *Arthurs,* 73 F3d at 447 (concluding that in applying plain error

analysis: "From what we can ascertain, we cannot say that his language problems were of such a magnitude as to have deprived him of a fair trial.") (citing United States v. Olano, 507 US 725, 736-37, 113 SCt 1770, 1779, 123 LEd2d 508 (1993)); United States v. Taylor, 54 F3d 967, 972-73 (1stCir 1995) (discussing "raise-or-waive" rule and exception for plain error); State v. Saldana, 310 Minn 249, 252, 246 NW2d 37, 39 ("The test . . . is whether the failure to appoint an interpreter hampered the accused in the presentation of his defense."); State v. Perez, 404 NW2d 834, 838 (MinnApp 1987) (citing test in *Saldana*). Plain error analysis is more appropriate in this type of case because:

> [t]he absence of an objection on this ground left the district court without notice of any claim that language difficulties bothered defendant to the extent now claimed on appeal. Had the court been so notified, it could have made further inquiry and, if necessary, taken steps to deal with the alleged problem. We cannot say, on the basis of the record now before us, that the court committed any error, much less one that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*Arthur*s, *supra*, 73 F3d at 447 (citing United States v. Olano, 507 US 725, 736, 113 SCt 1770, 1779, 123 LEd2d 508).

[¶71.]    Selalla cannot, however, establish plain error because he makes no showing of prejudice; i.e., that he was denied the interpretive services necessary to understand and effectively use the pretrial instructions. He simply asserts error as a matter of law.[14]  Under these circumstances, where there has been no showing of

---

14.    The dissent suggests that "hearing and understanding the preliminary instructions would have assisted the defendant in alerting his counsel to matters that could have assisted him in establishing reasonable doubt."

(continued . . .)

an actual denial of effective or meaningful participation in the trial, plain error is not established, and Selalla waived the right to object to this issue. *See* Gonzalez v. People of Virgin Islands, 109 F2d 215, 217 (3rdCir 1940); People v. Ramos, 26 NY2d 272, 274, 258 NE2d 197, 198, 309 NYS2d 906, 908 (NY 1970).

[¶72.]     The dissent's reliance on *State v. Calderon*, 270 Kan 241, 13 P3d 871 (Kan 2000) is misplaced. In that case, without consulting counsel or stating a reason, the trial judge instructed the interpreter to not interpret the closing arguments. 270 Kan at 246, 13 P3d at 875. At that point in the trial, the court's decision effectively denied the defendant of any meaningful opportunity to participate in closing argument. Thus, *Calderon* involved the complete denial of interpretation in a critical part of the trial, and therefore, that court understandably applied structural error analysis. In this case, however, the question only involves the impact that a delay in interpretation of preliminary instructions may have had, and there was no showing that any delay at this preliminary stage denied Selalla the opportunity to participate in the trial or communicate with counsel. Because Selalla's claims are factual in nature, *Calderon* does not support structural error analysis.

---

(. . . continued)

> *Infra* ¶84. There is, however, no evidence to suggest that this contingency occurred.
>
> The dissent also emphasizes that the failure to orally read jury instructions is reversible error. *Infra* ¶84, n22 (citing State v. Nelson, 1998 SD 124, ¶20, 587 NW2d 439, 447). The dissent fails to note that *Nelson* only applied this rule to the final jury instructions. *Nelson* expressly acknowledges the statute providing that preliminary instructions need not even be given: it is a matter
>
> (continued . . .)

KONENKAMP, Justice (dissenting).

**I.**

[¶73.]     When non-English speaking people bring their own interpreters to court to assist them in communicating with their lawyers and comprehending the proceedings, can judges commandeer those interpreters to work for the court in interpreting testimony?  That is the question we face here.  Defense counsel thought it important enough to have a personal interpreter for his client during trial that he hired one specifically to assist in interpreting all communications between himself and his client.  When counsel and client arrived in the courtroom, however, the trial judge, citing economics, appropriated the defense interpreter to work for the court.  Upon being allowed by the judge to make a record after the judge announced his decision, defense counsel told the court that he needed the interpreter he hired "to have a way of speaking with my client during the trial."  He explained:  "the separate [interpreter] is here, more as a personal interpreter, so my client and I can communicate because otherwise we can't."  Nonetheless, the court dismissed its interpreter and forced the defense to provide its retained interpreter for client communication and witness interpretation.[15]

_____

(. . . continued)

   of discretion.  *Nelson*, 1998 SD 124, ¶9, 57 NW2d at 443-44 (citing SDCL 15-6-51(a)).

15.   As defense counsel on appeal explains it, "The trial court sent away the court's interpreter, who would have been paid by state funds, and declared that the interpreter defense counsel had retained [and paid with county public defender funds] would [interpret] the proceedings."

#24137

[¶74.] At the outset, it must be noted, this is not a case where the defendant's need for an interpreter can be questioned. Obviously, the trial judge believed the defendant needed an interpreter because he originally arranged for a court interpreter and then "borrowed" the defendant's interpreter for the trial. This Court's comment in its opinion that the defendant knew some conversational English is irrelevant in the context of this case and should be no part of our analysis. As any first-year law student can attest, the language of the law is an alien tongue to those untrained in its obscurities.[16] It is unreasonable to imply that someone who knows some English would be able to make any sense of, much less fully understand, all the legal colloquies and language subtleties in the hurly burly atmosphere of a criminal trial.[17]

[¶75.] This is not a case where defense counsel asked the court to "appoint" a personal interpreter in addition to a trial interpreter. If he had, a showing of

---

16. The trial court took for granted there was a language disability. Indeed, it never required a hearing on the necessity for an interpreter. In their appellate briefs, both the defense and the State agree that the defendant was "not fluent" in English. At trial, defense counsel made it clear to the trial court that his client did not "speak English fluently." Since the trial judge was face-to-face with the defendant and accepted the need for an interpreter, how can we hedge on that now?

17. A non-English-speaking person is "any principal party in interest or witness participating in a legal proceeding who has limited ability to speak or understand the English language." Model Court Interpreter Act § 2B (1995). "Although the term 'translate' is frequently used interchangeably with or instead of 'interpret,' the activities are distinct and require different skills. Interpreting is oral rendering of one spoken language into another, while translation is the rendering of a written document from one language into a written document in another language. The Model Act recognizes that court interpreters will be required to perform sight translations, which involves reading and orally translating a written document." *Id*. at endnote 4.

necessity for two court-appointed interpreters at public expense would have been required. *See* Martinez Chavez v. State, 534 NE2d 731, 737 (Ind 1989). But here, when defense counsel hired a personal interpreter under the public defender's funds, why should counsel have to justify why it was necessary to have such an interpreter for a client? It bears stressing: defense counsel's interpreter was hired under the public defender's separate budget, not the court's budget.

[¶76.] Effective assistance of counsel "contemplates open communication unencumbered by unnecessary impediments to the exchange of information and advice." Frazer v. United States, 18 F3d 778, 782 (9thCir 1994) (citation omitted). It should make no difference in our analysis whether the interpreter was hired by private defense counsel or, as here, hired by the public defender, under the public defender's budget. Criminal defendants have the constitutional right to confront and cross-examine witnesses against them. The rights to confront and cross-examine would be pointless if the accused could not understand the testimony. *See* Commonwealth v. Robichaud, 264 NE2d 374, 376 (Mass 1970) (citation omitted) (discussing a defendant's right to be present at every stage of the trial). Courts, therefore, have a constitutional obligation to provide interpreters for those accused who do not sufficiently understand the English language. *See, e.g.*, United States v. Carrion, 488 F2d 12, 14 (1stCir 1973) (per curiam), *cert. denied*, 416 US 907, 94 SCt 1613, 40 LEd2d 112 (1974). That obligation does not fall on the accused. If counsel hires a personal interpreter for a client, a court should not be able to confiscate that interpreter to act for the court.

[¶77.]      This case illustrates what may become a continuing problem in our courts if we fail to allow necessary safeguards for the protection of non-English speaking people.  It would behoove us now to deal with this type of maneuvering lest it result in more deprivations of constitutional rights in the future.  As the State concedes, this is a matter of first impression for South Dakota.  We have never had a decision explaining the nature and scope of a non-English speaking criminal defendant's right to an interpreter.

[¶78.]      Unfortunately, South Dakota has no uniform standards for the regulation, qualification, and appointment of courtroom interpreters.[18]  There certainly is a need.  Census figures for the year 2000 indicate a rising number of South Dakota residents likely have limited English proficiency.  All our more populous circuits have experienced increased usage of language interpreters.  But the problem is more acute in Minnehaha County, where this trial occurred.  In the 1990 census, 960 Minnehaha County residents reported that they spoke only Spanish at home.  Ten years later, in 2000, 3,136 residents indicated that the only language spoken in their homes was Spanish.  More significantly, over half the

---

18.     The only statute dealing with appointment of interpreters for those who do not speak or understand English is SDCL 23A-22-11 (Rule 28): "A court may appoint an interpreter or translator of its own selection and may set reasonable compensation for him."  But there are few safeguards: "At least thirty-three states presently have statutes expressly extending privilege to interpreters if the communication is covered by attorney-client privilege." Charles M. Grabau and Llewellyn Joseph Gibbons, *Protecting the Rights of Linguistic Minorities:  Challenges to Court Interpretation*, 30 NewEngLRev 227, 270 (Winter 1996) (citation omitted).  South Dakota has no such statutory protection in spoken language interpretation.  The privilege extended by our statutes is only for sign language interpreters and relay service operators for the hearing impaired.  SDCL 19-13-31.

Spanish speaking residents in Minnehaha County reported that they spoke English less than "very well." That was double the number of Spanish speaking people who self-gauged their English proficiency in 1990. Similar percentages were reported by Minnehaha County residents speaking Asian languages. Only slightly lesser percentages were counted for residents speaking languages of Indo-European origin.[19] Since 2000, undoubtedly, the number of non-English speaking people in South Dakota has increased substantially.

[¶79.] Several courts have considered the question whether criminal defendants have rights to personal interpreters, in addition to court interpreters. Most have concluded that the appointment of "a separate interpreter is not necessary, so long as the defendant can confer effectively with counsel throughout the proceedings and understands the proceedings." *See* Patricia Walther Griffin, *Beyond State v. Diaz: How to Interpret "Access to Justice" for Non-English Speaking Defendants?,* 5 DelLRev 131, 148 (2002) (citing cases). A number of other decisions have labored with whether judges infringe on constitutional rights during trial when they "borrow" interpreters appointed for non-English speaking defendants to interpret the testimony of non-English speaking witnesses. See cases cited in *State v. Gonzales-Morales,* 958 P2d 339, 341-42 (WashCtApp 1998). With proper safeguards, these decisions have found no violation of the defendant's Sixth Amendment right to counsel. By offering a recess for counsel to consult with non-English speaking clients, courts balance "confrontation and due process against the

---

19. Source: CensusScope, Census 2000 analyzed by the Social Science Data Analysis Network (SSDAN).

public's interest in the economical administration of criminal law." United States v. Bennett, 848 F2d 1134, 1141 (11thCir 1988) (*quoting* United States v. Martinez, 616 F2d 185, 188 (5thCir 1980), *cert. denied*, 450 US 994, 101 SCt 1694, 68 LEd2d 193 (1981)).

[¶80.] But, of course, all these cases dealt with requests for court-appointed personal interpreters or the borrowing of court-appointed interpreters, not interpreters specially retained by defense counsel, as in this case.[20] Courts should have no right to seize personally retained interpreters for court use.

## II.

[¶81.] Compounding its error, the trial court told the interpreter not to interpret for the defendant its preliminary instructions as they were read for the jury. The court said the instructions could be later interpreted for the defendant. The record is void, however, on whether these preliminary instructions were ever translated for the defendant into Spanish. The record is also silent on whether the opening statements, final jury instructions, and closing arguments were interpreted for the defendant. As this Court notes, the State concedes that the trial court erred in not having the preliminary instructions contemporaneously interpreted for the defendant. But the Court disposes of the issue by concluding that the defendant failed to show prejudice. Such a conclusion might be correct if we used a plain error analysis. Here the error was more serious: it was a structural error. A "structural"

---

20. This is not an argument for the "right" to two interpreters. No, but when defense counsel retains a separate interpreter for a client, a trial judge should not be able to dismiss the court's interpreter, who it is obligated to provide, and then appropriate defense counsel's retained interpreter.

error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." Arizona v. Fulminante, 499 US 279, 310, 111 SCt 1246, 1265, 113 LEd2d 302 (1991). When a structural error occurs it is not subject to harmless error analysis based on proof of prejudice. Structural errors are presumptively prejudicial. State v. Lamere, 112 P3d 1005, 1013 (Mont 2005).

[¶82.]	The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment require a defendant's presence at every critical stage of a trial. Kost v. State, 344 NW2d 83, 84 (SD 1984) (citations omitted). Article VI, sec. 7 of the South Dakota Constitution provides: "In all criminal prosecutions, the accused shall have the right to defend in person and by counsel. . . ." And SDCL 23A-39-1 states that "[a] defendant shall be present . . . at every stage of his trial. . . ." When criminal trial proceedings are not interpreted for a non-English speaking defendant, that defendant is effectively absent from the trial. This constitutes a structural error.

[¶83.]	The Kansas Supreme Court dealt with a similar question in ruling that failure to interpret closing arguments was reversible error. There, the court wrote that "[t]he right to be present at one's criminal trial is a fundamental right." State v. Calderon, 13 P3d 871, 879 (Kan 2000). Such fundamental "right to be present includes a right to have trial proceedings translated into a language that [the defendant] understands so that he or she can participate effectively in his or her own defense." Id. at 879. Because the defendant's attorney did not object to the trial court's failure to provide an interpreter during closing arguments, the court

examined whether it should apply the stringent plain error standard. It ruled that it should not apply. *Id.* at 875-79. It concluded that

> the trial court denied Calderon a meaningful presence during closing argument, an error which implicates the basic consideration of fairness. Under these circumstances, this court is not permitted to determine that it was harmless beyond a reasonable doubt even though the error might have had little, if any, likelihood of having changed the result of the trial.

*Id.* at 879.

[¶84.] Here, as in *Calderon*, the defendant was denied "a meaningful presence at a critical stage of his trial." *See id.* at 879. This was no case of mere "delay" in the interpretation of the court's instructions. After the judge instructed the interpreter not to simultaneously interpret his instructions but to do it later, the record is barren of any indication that these instructions were ever interpreted for the defendant. Although we presume a court acted properly where there is a silent record, the presumption in favor of regularity at trial must give way when irregularity is clearly shown. *See* People v. Rodriquez, 213 CalApp2d 555, 560 (CalCtApp 1963). As the Kansas court noted, perhaps a failure to interpret closing arguments would be unlikely to change the outcome. After all, the evidence was in. Nonetheless, the court felt compelled to reverse. In our case, hearing and understanding the preliminary instructions and the opening statements in his own language would have assisted the defendant in alerting his counsel to matters that could have assisted him in establishing reasonable doubt.[21] How can a non-English

---

21. It must be remembered that we have previously held that failure to orally read jury instructions is reversible error. *See* State v. Nelson, 1998 SD 124, ¶20, 587 NW2d 439, 447.

speaking defendant meaningfully participate in a trial if the defendant cannot understand the court's legal directions that will ultimately help to decide guilt or innocence?

[¶85.]    Even the Attorney General's appellate brief concedes that "the State is uncomfortable with the manner in which the trial court dealt with the appointment and use of an interpreter. . . ."  We should be more than uncomfortable.  By upholding the improper procedure in this case, this Court perpetuates unfair and unconstitutional treatment of non-English speaking people.